**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, and WASHINGTON, *ex rel.* CHAD DIETZ, | Case No. 2:21-cv-00272-CCW<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| vs. | |
| PHILIPS RS NORTH AMERICA LLC d/b/a PHILIPS RESPIRONICS, KONINKLIJKE PHILIPS N.V., and PHILIPS NORTH AMERICA, | |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

# Table of Contents

NATURE OF THE CASE ...................................................................................................... 1

JURISDICTION AND VENUE .......................................................................................... 4

PARTIES ................................................................................................................................. 5

LEGAL AND REGULATORY BACKGROUND .......................................................... 8

    A.    The Federal False Claims Act and the Plaintiff State Statutes ............................. 8

    B.    The Government Healthcare Programs ................................................................ 10

          1.    The Medicare Program ............................................................................ 10

          2.    The Medicaid Program ............................................................................ 17

          3.    TRICARE ................................................................................................. 19

          4.    The Federal Employees Health Benefits Program .................................. 20

    C.    The Anti-Kickback Statute ("AKS") ................................................................... 21

DEFENDANTS' FRAUDULENT KICKBACK SCHEMES ...................................... 23

    D.    The PAMS Kickback Scheme ............................................................................ 24

          1.    Billing Codes for CPAP Machines and Resupplies ................................ 24

          2.    CPAP Coverage Rules and DME Suppliers' Patient Adherence Programs ........................................................................................................ 27

          3.    Philips Respironics' Patient Adherence Management Service ("PAMS")29

          4.    Prior Related DOJ Settlement and the Genesis of the PAMS Program.... 33

          5.    The PAMS Program Amounts to an Illegal Kickback Arrangement ....... 35

    E.    The Free CEUs Kickback Scheme ...................................................................... 48

CAUSES OF ACTION ...................................................................................................... 53

PRAYER FOR RELIEF .................................................................................................... 97

DEMAND FOR JURY TRIAL ........................................................................................ 98

## NATURE OF THE CASE

1.      *Qui tam* relator Chad Dietz (the "Relator") brings this action against defendants Philips RS North America LLC d/b/a Philips Respironics ("Philips Respironics," "Respironics" or the "Company"), Koninklijke Philips N.V. ("Royal Philips"), and Philips North America (collectively, the "Philips Defendants"), under the federal False Claims Act (the "FCA"), 31 U.S.C. §§ 3729, *et seq.*, on behalf of the United States of America.

2.      Relator also brings this action against Defendants on behalf of the states of California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Washington (collectively, the "Plaintiff States"), under the *qui tam* provisions of state laws in the Plaintiff States that are analogous to the federal FCA (the "Plaintiff State Statutes"). *See* ¶ 25 for a list of the specific Plaintiff State Statutes at issue in this case. Hereinafter, the United States of America and the Plaintiff States will be referred to, collectively, as the "Government."

3.      The allegations herein are based upon Relator's own direct and independent knowledge as well as an investigation undertaken by Relator's counsel.

4.      Relator brings this action against the Philips Defendants pursuant to the FCA and the Plaintiff State Statutes to recover payments made on false claims Defendants caused to be submitted, claims that were false because they were the result of the Philips Defendants' direct and knowing implementation of two separate illegal kickback schemes: the PAMS program and the provision of free Continuing Education Units (CEUs).

5.      The relevant time period for the Amended Complaint is mid-2016 to January 2023. The relevant time period starts in mid-2016 because that is when Respironics launched the PAMS

program (described in detail later in the Amended Complaint). Relator also asserts that Respironics engaged in the kickbacks involving free CEUs as early as mid-2016. The relevant time period ends in January 2023, at a time when the Government was in the midst of investigation the claims asserted in Relator's original complaint, because that is when Respironics abruptly eliminated its entire PAMS program. Relator also notes that Respironics also abruptly terminated its entire CEU program on December 31, 2022

6.      Below, Relator's Amended Complaint describes in detail the Philips Defendants illegal kickback schemes. To summarize, Respironics manufactures a medical device known as a continuous positive airway pressure ("CPAP" machine) which is used to treat Obstructive Sleep Apnea ("OSA"). Respironics sells the CPAP machines to durable medical equipment ("DME") suppliers who specialize in respiratory equipment such as CPAP machines. The DME suppliers then provide the CPAP machines to patients who need them, ones who have a prescription for the device. The Government Healthcare Providers, such as Medicare and Medicaid, reimburse the DME suppliers pursuant to a capped rental arrangement. That means the Government Healthcare Programs pay $100 per month to rent the machine for up to 13 months ($1,300 total), at which time the device is paid for and the patient gets to keep the machine. Importantly, CPAP machines also have several accessories, like tubing and masks, that need to be replaced every few months. The Government pays for these resupplies as well at a price that averages around $1,000 per year.

7.      There is, however, a catch to the billing arrangement. The Government Healthcare Programs have a usage requirement criteria, called "patient adherence," that must be met in the first 90 days of the rental (basically to make sure the patient needs the machine) in order for the Government to pay for the full capped rental period and to pay for the valuable resupplies. Not

surprisingly then, the DME suppliers put substantial time, money, and effort into making sure their patients meet the patient adherence requirement.

8. The first kickback scheme (the PAMS kickbacks) arises from the fact that in mid-2016, Respironics launched its own Patient Adherence Management Service ("PAMS"), a program designed to compete with the DME suppliers' own patient adherence systems. PAMS was a high-end, intensive, and comprehensive program that put huge resources, including respiratory therapists and sleep coaches, into making sure as many patients as possible would meet the patient adherence criteria set by the Government Healthcare Programs. To implement PAMS, Respironics entered into contracts with DME suppliers charging them a per patient per month rate. PAMS started with a rate of $55 per patient. A key to understanding the kickback scheme is to note that there are only two manufacturers of CPAP machines, Respironics and ResMed, that dominate the market. And, once a DME supplier enters a patient into PAMS, the DME supplier and the patient are locked into using only a Respironics CPAP machine and Respironics resupplies. Accordingly, PAMS was inherently a program that could increase Respironics sales and increase its market share, vis-à-vis ResMed, by getting as many DME suppliers as they could into PAMS contracts.

9. This is when the Respironics Sales Department took over. They were in charge of negotiating and implementing the PAMS contracts with the DME suppliers and they saw the opportunity to use PAMS to generate huge increases in sales of Respironics CPAP products as well as gain market share from ResMed. The Sales Department used PAMS as a sales tool by lowering the price per patient to as low as $15 per patient, a price that was well below fair market value. The plan worked well because the DME suppliers knew they could not possibly get a patient adherence program as good as PAMS for a price close to $25 or $15 per patient. The Sales Department used low prices on PAMS to target specific DMEs to induce them to accept PAMS

and lock in additional business for Respironics. It became a very effective way for Respironics to increase sales and gain market share.

10.    The problem is that offering a valuable service, such as PAMS in this case, at below fair market prices with the intent to induce the DME suppliers to purchase more CPAP products from Respironics precisely fits the definition of an illegal kickbacks that violates the AKS. The Complaint goes into detail explaining how the Respironics Sales Department from top managers to the sales reps, used PAMS as an illegal kickback to generate new sales and gain market share.

11.    The second kickback scheme (the free CEUs kickbacks) relies on the fact that professional staff at DME suppliers and referral sources for DME suppliers, such as physician practices, have Continuing Education requirements that they must periodically meet. Respironics provided – for free – lectures and training sessions that qualified as Continuing Education Units ("CEUs") to certain DME suppliers and their referral sources. Not all DME suppliers received the free CEUs. Rather, the Sales Department controlled the use of the free CEUs, giving them for free to DME suppliers who, the Sales Department believed, could be induced to increase their sales of CPAP machines and resupplies and to gain market share away from ResMed. It was, as the Relator learned from Respironics management, a straight kickback arrangement: I will give you free CEUs if you will continue to use, or increase your use of, Respironics CPAP products.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730. This Court has supplemental jurisdiction over the counts asserted under the Plaintiff States Statutes pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

13.    This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants are found, transact business, and

committed violations of 31 U.S.C. § 3729 in this District. Moreover, Defendant Philips Respironics is based in this district and many of the proscribed acts occurred in this district.

14. This action is not based upon the prior public disclosure of allegations or transactions in a federal or state criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal or state report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in either the FCA or the Plaintiff States Statutes.

15. To the extent there has been a public disclosure unknown to Relator, Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4).

16. Prior to filing this action, Relator voluntarily disclosed to the United States and the Plaintiff States the information on which the allegations or transactions discussed herein are based within the meaning of 31 U.S.C. § 3730(e)(4)(B) and the corresponding provisions of the plaintiff State Statutes.

## PARTIES

17. **Relator** is a resident of the State of Indiana and a former employee of Philips Respironics. He began working at the Company in June 2011 as an inside sales manager (meaning, sales by phone) in a regional sales territory that primarily covered the States of North Carolina and South Carolina. In 2013, Relator's territory changed to a different regional sales territory, one that primarily covered the States of Indiana and Illinois. In 2015, Relator was promoted to a field sales manager in the same Indiana and Illinois sales territory. While working at Respironics, Relator sold a range of products designed to assist patients with respiratory and sleep therapy, including CPAP, BiPAP, and NIV machines.

18. In December 2021, after a ten-and-a-half-year career at Philips Respironics, Relator left the Company. During his lengthy professional career at Philips Respironics, Relator gained

extensive knowledge of the Company's nationwide marketing and sales practices and procedures for the sale of CPAP machines and their resupplies, information that supports the allegations of this Complaint. Most importantly, Relator learned specific details concerning how Philips Respironics used the illegal kickback schemes alleged herein to market and sell the Company's CPAP machines and resupplies.

19. **Defendant Philips Respironics** is a Pennsylvania corporation with its corporate offices located in Murrysville, Pennsylvania. Philips Respironics manufactures and sells a variety of medical products and equipment for respiratory and sleep therapy. The allegations of the Amended Complaint are limited to Respironics's sale of CPAP machines and their resupplies.

20. **Defendant Royal Philips** is a multinational health technology corporation headquartered in Amsterdam, The Netherlands. It sells a wide range of products and services, including medical devices (e.g., MRI systems, ultrasound imaging systems, image-guided therapy systems); consumer products (e.g., shavers, home care appliances, televisions, monitors, and video equipment); and Philips Hue consumer lighting and automotive lighting products.

21. In 2008, Royal Philips acquired Respironics in full through a stock purchase plan. At the time, Respironics was an independent Pennsylvania based company focused on the manufacture and sale of respiratory products. Upon completion of the sale, Respironics became a wholly owned subsidiary of Royal Philips and changed its name to Philips Respironics.

22. **Defendant Philips North America** is a subsidiary of Royal Philips and is headquartered in Andover, Massachusetts.

23. Relator brings this action on behalf of the United States pursuant to the *qui tam* provisions of the federal FCA. 31 U.S.C. § 3729 et seq. The United States is a party-in-interest to this action because the Relator seeks recovery of damages for harm done to federally funded health

insurance programs, including, but not limited to the following:

- **Medicare**: a federal health insurance program administered by the Centres for Medicare & Medicaid Services ("CMS") for the elderly and disabled. *See* 42 U.S.C. §§ 1395–1395hhh.

- **Medicaid**: a jointly funded federal and state public-assistance program that pays for medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396–1396v. The federal portion of the Medicaid program is administered by CMS.

- **TRICARE**: a managed healthcare program established by the United States Department of Defense. *See* 10 U.S.C. § 1071 *et seq.* TRICARE covers eligible beneficiaries, which, *inter alia*, includes active-duty members of the Uniformed Services and their dependents as well as retired members of the Uniformed Services and their dependents.

- **Federal Employees Health Benefits Program ("FEHBP")**: a healthcare program that provides healthcare benefits for federal government employees and retirees, including their family members and survivors. *See* 5 U.S.C. §§ 8901 through 8914.

24. Collectively, the Medicare, Medicaid, TRICARE, and FEHB programs will be referred to throughout the Complaint as the "Government Healthcare Programs."

25. As with the United States, the Plaintiff States are also parties in-interest to this action. That is because, under the *qui tam* provisions of the Plaintiff State Statutes, the Relator seeks recovery of damages for harm done to the Plaintiff States' portion of the Medicaid program. *See* 42 U.S.C. §§ 1396–1396v.

26. The Plaintiff State Statutes are comprised of the following state false claims laws: California False Claims Law, Cal. Gov. Code § 12650 et seq.; Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-303.5 through 25.5-4-310; Connecticut Gen. Stat. § 4-274 et seq; Delaware False Claims & Reporting Act, 6 Del. Code § 1201 et seq.; the District of Columbia's False Claims Act, D.C. CODE §§ 2-381.01 et seq.; Florida False Claims Act, Fla. Stat. §§ 68.081-68.09; Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, et seq.; Hawaii False Claims Law, HRS § 661-21 et seq.; Illinois Whistleblower Reward & Protection Act, 740 ILCS

175/1 et seq.; Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5.-1 et seq.; Iowa False Claims Act, Iowa Code § 685.1 et seq.; Louisiana Qui Tam Action Act, La. R.S. 46:438.1 et seq.; Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601 et seq.; Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, § 5A, et seq.; Michigan Medicaid False Claims Act, Mich. Comp. Laws Ann. § 400.601, et seq.; Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq.; Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq.; Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. § 357.010 et seq.;  the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq.; New York False Claims  Act, N.Y. State Fin. Law § 187 et seq.;  North  Carolina  False  Claims Act, N.C. Gen. Stat. Ann. § 1-605 et seq.; Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. tit. 63, § 5053.1 et seq.; Rhode Island False Claims Act, R.I. Gen. Laws Ann. § 9-1.1-1 et seq.; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.; Texas False Claims Act, Tex. Hum. Res. Code Ann. § 36.001 et seq.; Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.; and Washington Health Care False Claims Act, Wash. Rev. Code Ann. § 48.80.010 et seq.

## LEGAL AND REGULATORY BACKGROUND

**A.     The Federal False Claims Act and the Plaintiff State Statutes**

27.     The FCA provides, *inter alia*, that any person who:

> (a)(1)(A) knowingly presents, or *causes to be presented*, a false or fraudulent claim for payment or approval; [or]
>
> (a)(1)(B) knowingly makes, uses, or *causes to be made or used*, a false record or statement material to a false or fraudulent claim . . .

is liable to the United States for three times the amount of damages which the United States sustains, plus a civil penalty per violation. 31 U.S.C. § 3729(a)(1)(A) and (B) (emphasis added).

28.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest[.]" *Id.* § 3729(b)(2)(A)(i)–(ii). Requests for reimbursement made to the Government Healthcare Programs identified herein, including Medicare and Medicaid, are "claims" under the FCA.

29.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)–(iii). The FCA does not require proof of specific intent to defraud. *Id.* § 3729(b)(1)(B).

30.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

31.     The standard of proof under the FCA is a preponderance of the evidence. 31 U.S.C. § 3731(d).

32.     Under the FCA, the United States is entitled to recover three times the amount of the damages arising from each false claim and, for each false claim or overpayment, a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. *See* 28 C.F.R. § 85.5 (setting forth the current civil penalties level of not less than $13,946 and not more than $27,894 for violations of the FCA).

33.     The Plaintiff State Statutes either mirror or are analogous to the federal FCA statute described above.

**B.      The Government Healthcare Programs**

**1.      The Medicare Program**

34.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. §§ 1395, *et seq.*, known as the Medicare program, as part of Title XVIII of the Social Security Act, to provide health insurance coverage for people aged 65 and older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426a. Medicare is administered by CMS.

35.     When a healthcare provider performs a service, or provides a product for a Medicare beneficiary, CMS does not pay the healthcare provider's claim for reimbursement directly. Rather, CMS contracts with private contractors, known as Medicare Administrative Contractors (MACs), to perform various administrative functions on its behalf, including reviewing and paying claims submitted by healthcare providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. MACs generally act on behalf of CMS to process and pay Medicare claims and perform administrative functions on a regional level. MACs may issue Local Coverage Determinations regarding whether or not a particular item or service is covered. 42 U.S.C. § 1395ff(f)(2).

36.     The MACs, on behalf of Medicare, are the ones who pay the healthcare providers who participate in Medicare. In the present case, Philips Respironics does not participate in Medicare or any of the other Government Healthcare Programs. That is because Philips Respironics does not sell its CPAP machines and resupplies directly to patients, it does so through middlemen, so it has no need to participate in, and submit claims for reimbursement to, the Government Healthcare Programs.

37.     In practice, what happens is that Philips Respironics sells its CPAP machines and resupplies to entities known as durable medical equipment ("DME") suppliers, sometimes referred to as DME providers. The DME providers then supply Philips Respironics' equipment directly to patients who need it (the patient must have a doctor's prescription to qualify for the device). If the patient is a Medicare beneficiary, or is covered by one of the other Government Healthcare Programs, the patient does not pay the DME supplier directly for the machine, rather the DME supplier submits a claim for reimbursement to the relevant Government Healthcare Program. Thus, it is the DME suppliers (not Philips Respironics) who participate in the Medicare program and it is the DME suppliers who submit claims for reimbursement to Medicare or one of the other Government Healthcare Programs.

38.     Most importantly for the present case, when Philips Respironics pays a kickback to a DME supplier to induce that supplier to purchase its equipment – the central allegation of Relator's case – the DME supplier's claims for reimbursement that arose from the kickback are, using the express language of the FCA, the "result of a kickback." The AKS clearly states that claims that are the "resulting from" a kick are *per se* false under the FCA. 42 U.S.C. § 1320a–7b(g). And, even though the DME supplier presented the false claim to the Government, the Philips Defendants are liable under the FCA because they paid the kickback which caused the DME supplier to submit a false claim.

39.     Turning back to the Medicare programs' rules and regulations, to *participate* in Medicare, the program requires that all healthcare providers and suppliers, including CPAP DME suppliers, must certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations, including certifying that they will not engage in any kickback arrangement in violation of the AKS. *See* 42 C.F.R. § 424.516(a)(1).

40.     Medicare only pays for items or services that are reasonable and necessary for the "diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k); Medicare Benefit Policy Manual Ch. 16 § 20.

41.     The Medicare program has four parts: Parts A, B, C, and D. Medicare Parts B and C are relevant to this Complaint because the Philips Defendants have caused DME suppliers to submit false claims under these two types of Medicare plans.

        a.      **Medicare Part B**

42.     Medicare Part B, often referred to as "Traditional Medicare," authorizes the payment of federal funds directly to providers on a fee-for-service basis for reasonable and necessary non-hospital healthcare services and products. Throughout the relevant time period, Medicare Part B paid for reasonable and necessary CPAP machines and their resupplies. *See* 42 U.S.C. §§ 1395y(a)(1)(A) and (B). *See also* ¶¶ [ - ] for a full description of the Medicare, and other Government Healthcare Programs, billing codes, rules, and regulations that apply to claims for CPAP machines (known as capped rentals) and their resupplies.

43.     CMS provides reimbursement for Medicare Part B claims from the Medicare Trust Fund.  MACs assist CMS in the administration of the Part B program and are responsible for processing the payment of Part B claims to providers on CMS's behalf.  42 U.S.C. § 1395u.

44.     Healthcare providers and suppliers are prohibited from knowingly presenting or causing to be presented claims for items or services that the person knew or should have known were not reasonable and necessary, knew or should have known were false or fraudulent, or knew or should have known the claim or underlying transaction did not comply with all relevant Medicare laws, rules, and regulations, including the federal anti-kickback statute. *See* 42 U.S.C. §

1395y(a)(1)(A) and 42 U.S.C. § 1320a-7(b)(7) (providers may be excluded for fraud, kickbacks, and other prohibited activities).

45.     Because it is not feasible for Medicare personnel to review every patient's medical record for the millions of claims for payment they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

46.     Moreover, MACs are required to pay "clean claims" – *i.e.*, claims that on their face have no defect or impropriety or have no special circumstance requiring a particular treatment that prevents timely payment – within 30 days of receipt. 42 U.S.C. § 1395u(c)(2). Accordingly, once a provider submits a claim for reimbursement to Medicare, the claim is usually paid directly to the provider without any review of supporting documentation, including medical records.

47.     To obtain Medicare reimbursement for CPAP machines and their resupplies, the DME suppliers must submit a claim for reimbursement on a CMS-1500 claim form[1] or file claims via the 837P electronic process ("837P").[2] Among the information the DME supplier must include on the CMS-1500 claim form are certain five-digit codes, known as Current Procedural Terminology Codes ("CPT codes") or Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered for which reimbursement is sought. In concert with the CPT codes, a separate unique numeric identifier code, or codes, corresponding to the patient's medical condition based on the International Classification of Diseases ("ICD") Manual,

---

[1] *Form CMS-1500: Health Insurance Claim Form*, CMS, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (last visited August 21, 2024).

[2] The original CMS-1500 claim form was a paper copy (which is still in use) but over the years CMS has adopted electronic equivalents, such as the 837P electronic form, which contain all of the same requirements and certifications as the original CMS-1500. For ease of reference, the Complaint will use the phrase "CMS-1500" to refer to the original paper claim form and all of its electronic equivalents.

is also provided on the claim form. The current versions of the ICD codes in use are known as ICD-11. To be payable by Medicare, the claim must identify both the CPT or HCPCS code that the provider is billing for (the billing code) and the corresponding ICD-11 code (the diagnostic code) for the patient's medical condition that supports the medical reasonableness and necessity of the provider's service.

48.     Critically, each and every CMS-1500 Claim Form also contains a certification that must be signed by the DME supplier in order for Medicare to pay the claim (or Medicaid, since the Medicaid program uses the same CMS-1500 Claim Form). The certification states, among other things, that: (a) "the information provided is true, accurate, and complete"; (b) the services rendered are medically indicated and necessary for the health of the patient; (c) the DME supplier understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws," and (d) the claim complies "with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to *the Federal anti-kickback statute* and Physician Self-Referral law (commonly known as Stark law)."[3] (emphasis added). The CMS-1500 claim form also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."[4]

49.     Overall, the Medicare statutes, program rules, and regulations make it clear that healthcare providers, including the DME suppliers in the present case, are prohibited from

---

[3] CMS-1500, *supra* note 2, at p. 2.

[4] *Id.*

knowingly presenting or causing to be presented claims for items or services that the person knew or should have known were not medically necessary, or knew or should have known were false or fraudulent. *E.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1320a-7(b)(7) (providers may be excluded for fraud, kickbacks, and other prohibited activities).

### b.  Medicare Part C

50.    Medicare Part C, commonly known as the "Medicare Advantage" program, is the "all-in-one" alternative to Traditional Medicare under Medicare Part A. For patients who enroll in a Medicare Advantage Plan, the plan will provide all of the patient's Part A (Hospital Care) coverage and Part B (Non-Hospital Medical Care) coverage. Under Part C, CMS authorizes private insurance companies (*e.g.*, Aetna, Humana, and United Healthcare) to offer health insurance plans to individuals who would otherwise be eligible for Traditional Medicare. The private insurance plans that are offered through Part C are paid for in full by federal government funds.

51.    The private insurers offering Medicare Advantage ("MA") plans, known as Medicare Advantage organizations ("MAOs"), contract with CMS to administer Part C benefits under a managed-care model rather than Part B's traditional fee-for-service model. MA plans are required by statute to provide the *same level of healthcare service* as that available through Traditional Medicare. *See* 42 U.S.C. § 1395w–22(a)(1) (providing that MA plans shall provide to enrollees all items and services that are available to Medicare beneficiaries under Part A and Part B). Moreover, *all of the protections and regulations* applicable to Traditional Medicare equally apply to the practices of the MAOs.

52.    The types of health insurance plans that may be offered by MAOs include a health maintenance organization ("HMO"), a regional or local preferred provider organization ("RPPO" or "LPPO"), a medical savings account ("MSA"), or a private fee-for-service ("PFFS") plan.  42 U.S.C. § 1395w–21(a)(2).

53.     Pursuant to their contracts with CMS, the MAOs are paid a fixed, monthly capitated rate based on the number of Medicare beneficiaries they service and the geographic location, income status, gender, age, and health status of those beneficiaries.

54.     Just like Traditional Medicare, MAOs' contractual obligations and the applicable CMS regulations require that all MAOs have the proper systems in place to ensure that they only pay for services that are *reasonable and necessary* based on objective medical criteria. *See* 42 C.F.R. § 422.101 (requiring MAOs to comply with Traditional Medicare coverage guidelines, which include payment only for services that are reasonable and necessary); 42 C.F.R. § 422.504 (requiring MAOs to provide all benefits covered by Medicare in a manner consistent with professionally recognized standards of health care).

55.     MAOs' contracts with providers must include a provision requiring that any services or other activity performed by such providers are consistent and comply with the MA organization's contractual obligations with CMS. 42 C.F.R. § 422.504(i)(3). MAOs' contracts with providers must also include accountability provisions, including the requirement that providers and their subcontractors comply with all Medicare laws, regulations, and CMS instructions, including the federal Anti-Kickback Statute. 42 C.F.R. § 422.504(i)(4)(v), Medicare Managed Care Manual, Ch. 11 § 100.4.[5]

56.     MAOs are further obligated to comply with Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to the FCA and the AKS. Medicare Managed Care Manual, Ch. 11 § 120. MAOs receiving Federal payments under MA contracts, and medical contractors (*such as the CPAP DME suppliers in this case*) that are

---

[5] *Medicare Managed Care Manual: Chapter 11 - Medicare Advantage Application Procedures and Contract Requirements* at p. 25 (Rev. 82, Apr. 25, 2007), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c11.pdf

paid by an MAO to fulfill its obligations under its MA contract, are subject to the same laws that are applicable to all other individuals and entities receiving Federal funds, including the FCA and the AKS. Accordingly, MAOs must inform contracted providers, such as the DME suppliers here, that payments they receive are, in whole or in part, from Federal funds.

57.     Medical services and items furnished to the beneficiaries who are enrolled in MA plans are billed to the plans' respective MAOs for payment. All such insurance claims paid by MAOs, as well as the MAOs' associated administrative costs, are paid using funds provided by CMS through the capitated payments.

58.     The contracts between MAOs and providers include a prompt payment provision, the terms of which are developed and agreed to by both the MAO and the provider. 42 C.F.R. §§ 422.504(c), 422.520(b). Accordingly, much like the situation in which a provider submits a clean claim for payment under Medicare Part B, once a contracted provider submits a clean claim to the MA plan, the claim must be paid quickly (usually within 30 days) and paid directly to the provider without any review of supporting documentation, including medical records.

### 2.     The Medicaid Program

59.     Medicaid is a joint Federal-state program created in 1965 that primarily provides healthcare benefits for the poor and disabled.

60.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b).  Depending on the state, FMAP ranges from 50 percent to as high as 83 percent.

61.     The Medicaid programs in all of the Plaintiff States reimburse for CPAP machines and their resupplies. The majority of states award contracts to private companies to evaluate and

process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies generate funding requests to the state Medicaid programs.

62.    Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid Federal funding needs. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of Federal funding each state will be permitted to draw down as it incurs expenditures during the quarter.  The state then draws down Federal funding as actual provider claims are presented for payment.  After the end of each quarter, in order to reconcile the estimated expenditures to actual expenditures, the state submits to CMS a final expenditure report that provides the basis for adjustment to the quarterly Federal funding amount. *See* 42 C.F.R. § 430.30.

63.    Providers who participate in the Medicaid program must sign enrollment agreements with their states where they must certify compliance with the Federal and state Medicaid requirements.

64.    Although there are variations among the states, the agreements typically require the prospective Medicaid providers to agree they will comply with all federal and state laws and Medicaid rules and regulations in billing the state Medicaid program for services or supplies furnished.

65.    Medicaid providers in many states must also affirmatively certify compliance with applicable federal and state laws and regulations, including the federal Anti-Kickback Statute, as a condition of payment of the claims submitted for reimbursement by Medicaid.

66.    Many Medicaid service providers are either reimbursed directly by states on a fee-for-service basis, or through claims submitted to Managed Care Organizations ("MCOs") in programs similar to the Medicare Advantage plans described in the previous section of this

Complaint. States contract with MCOs to provide benefits to Medicaid beneficiaries, and the MCOs receive monthly capitation payments for providing these services.

67.     Providers submit claims for payment to MCOs for services provided to Medicaid beneficiaries enrolled in the managed care plan. Claims for payment submitted to MCOs are deemed to be "claims" under the FCA since (i) the managed care plan is a "contractor, grantee, or other recipient," (ii) the money is being used "to advance a Government program or interest," and (iii) the Government provides or has provided a portion of the money requested, or will reimburse the MCO for a portion of the money requested. 31 U.S.C. § 3729(b)(2)(A). In their agreements with providers, MCOs require compliance with the rules and regulations of the Medicaid program

**3.     TRICARE**

68.     TRICARE is the federal health care system for uniformed service members, retirees, and their families worldwide. TRICARE is a federal health benefits program, established by 10 U.S.C. §§ 1071-1110b, that offers a triple option benefit plan: an HMO option; a PPO option; and a fee for service option. TRICARE covers CPAP machines and their resupplies for its beneficiaries. Overall responsibility for the administration of TRICARE resides with the Secretary of the Department of Defense (DOD).

69.     The regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying, to the extent practicable, the same reimbursement scheme and coding parameters that the Medicare program applies. 10 U.S.C. § 1079(h)(1) (individual health care professional) (citing 42 U.S.C. §§ 1395, *et seq.*).

70.     Providers of services to TRICARE beneficiaries are required to comply with TRICARE's program requirements, including its anti-abuse provisions. 32 C.F.R. § 199.9(a)(4). TRICARE regulations provide that claims submitted in violation of TRICARE's anti-abuse

provisions can be denied. *Id.* § 199.9(b). Kickback arrangements are included within the definition of abusive situations that constitute program fraud. *Id*. §§ 199.2(b), 199.9(c)(12).

71.     Like Medicare, TRICARE also prohibits fraudulent conduct such as, *inter alia*, payment arrangements by health care providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge TRICARE through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits. 32 C.F.R. § 199.9(c). Such arrangements are presumed fraudulent when entered into pursuant to the provision of covered services to beneficiaries. 32 C.F.R. §§ 199.9(c)(1)-(13).

72.     As with Medicare, providers submit claims to TRICARE using the CMS-1500 or an electronic equivalent. Providers therefore make the same certifications in submitting claims to TRICARE as they do when submitting claims to Medicare.

73.     Because it is not feasible for the TRICARE program or its contractors to review medical records corresponding to each of the claims for payment it receives from providers, the program relies on providers to comply with TRICARE requirements and submit truthful and accurate certifications and claims.

**4.      The Federal Employees Health Benefits Program**

74.     The Government, through the U.S. Office of Personnel Management ("OPM"), funds and oversees the FEHB program. The FEHB program provides healthcare benefits, including coverage of CPAP machines and their resupplies, for eligible federal government employees and retirees, including their family members and survivors. *See* 5 U.S.C. § 8901 et seq.

75.     In all relevant aspects, the FEHB program's participation and reimbursement requirements for providers are similar to those for participation and reimbursement under Medicare, including the requirement that the FEHB program, like Medicare, will only pay for

DME items that are reasonable and necessary and providers must comply with all applicable federal and state laws and regulations, including the federal Anti-Kickback Statute.

**C.      The Anti-Kickback Statute ("AKS")**

76.     The AKS prohibits any person from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, to induce another person "to purchase, lease, order, arrange for or recommend purchasing, leasing, or ordering" any goods or services for which payment may be made, in whole or in part, by a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(2). If any purpose of the remuneration is to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program, the AKS is violated. The AKS's definition of a "federal healthcare program" is sufficiently broad to include, among others, Medicare, Medicaid, TRICARE, and the FEBH program (all of the Government Healthcare Programs).

77.     The statute is clear on the following crucial point: the AKS prohibits paying remuneration to a person to "induce" them to "order," "purchase," or "lease" a product that is paid for by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(2). Applied to the present case, this means that Philips Respironics cannot provide remuneration to a CPAP DME supplier to induce them to order, purchase, or lease one of the Company's CPAP machines or resupplies when the product is paid for by a Government Healthcare Program. Of course, as alleged in detail throughout this Complaint, this is exactly what the Philips Defendants did, in violation of the AKS and the FCA, through its PAMS and CEU kickback schemes.

78.     The rationale for the AKS's strict rules prohibiting kickbacks is based upon sound public policy concerns. Congress created the AKS as a way to prevent arrangements in the healthcare field that can lead to (a) the distortion of medical decision making, (b) the overutilization of services and supplies, (c) unfair competition which freezes out competitors who

are unwilling to pay kickbacks, and (d) increased costs for Government Funded Healthcare Programs. Illegal kickbacks can also adversely affect the quality of patient care by encouraging the ordering of services or products based on personal profit rather than the patient's best medical interest.

79.    To protect the integrity of the federal government's healthcare programs from such difficult-to-detect harms, Congress enacted the AKS as a *per se* prohibition against the payment or receipt of kickbacks in any form. Thus, paying or receiving kickbacks violates the AKS regardless of whether the particular kickback actually gives rise to the harm the statute is intended to prevent, such as the harm that comes from the distortion of medical decision making or the overutilization of government-run healthcare. *See* 65 Fed. Reg. 59,434 and 59,440

80.    The term "remuneration" as defined in the AKS includes the transfer of anything of value "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b). When interpreting the applicability of the AKS, courts have held that the term "remuneration" should be read broadly to include valuable services and other forms of direct or indirect remuneration.

81.    In 2010, Congress enacted legislation to specify that a violation of the AKS gives rise to liability under the FCA. *See* Pub. L. No. 111-148, § 6402(f), 124 Stat. 119. Pursuant to the Patient Protection and Affordable Care Act of 2010 ("PPACA"), "a claim that includes items or services *resulting from a violation of this section [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]*." 42 U.S.C. § 1320a-7b(g) (emphasis added); *see also, e.g.*, *Guilfoile v. Shields*, 913 F.3d 178, 190–91 (1st Cir. 2019) ("§ 1320a-7b(g)'s obviation of the 'materiality' inquiry essentially codifies the long-standing view that AKS violations are 'material' in the FCA context.").

82.     Moreover, according to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854. Thus, if a relator proves that a claim for reimbursement does not comply with the AKS (*i.e.*, it is tainted by an illegal kickback), then the tainted claim for reimbursement also constitutes, as a matter of law, a "false claim" for purposes of the FCA. *See* 42 U.S.C. § 1320a-7b(g).

## DEFENDANTS' FRAUDULENT KICKBACK SCHEMES

83.     The AKS, as described above, prohibits the offer or payment of any "remuneration" – which, under the AKS, includes anything of value – to "induce" any purchase, lease, order, or referral of any type of healthcare item or service paid for by a Government Healthcare Program. *See* 42 U.S.C. § 1320a-7b(b)(2); *see also* ¶¶ 72-78 for a fuller explanation of the AKS. Moreover, compliance with the AKS is a *condition of payment* for Medicare, Medicaid, TRICARE, and the FEHB program, all of them Government Healthcare Programs. *See* ¶¶ 33-71 for a description of these healthcare programs.

84.     In spite of these legal obligations, the Philips Defendants have *caused* many thousands of claims for its CPAP machines and resupplies, claims that were false because they were the result of Philips Respironics' illegal kickbacks, *to be presented* to the Government Healthcare Programs for payment. *See* 31 U.S.C. § 3729(a)(1)(A) (FCA liability flows to anyone who "causes to be presented" a false claim for payment); *see also* 42 U.S.C. § 1320a-7b(g) ("a claim that includes items or services resulting from a violation of this section [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]).

85.     Specifically, during the relevant time period, Philips Respironics engaged in two specific kickback schemes that caused the presentation of many thousands of false claims for reimbursement: (1) the PAMS kickback scheme and (2) the free CEUs kickback scheme.

**A.      The PAMS Kickback Scheme**

86.     To understand the PAMS kickback scheme, it is important to first have an understanding of Medicare's billing codes and coverage rules for CPAP machines and resupplies: the products central to the allegations of this Complaint. They are of particular importance in this case because the billing codes and coverage rules provide an incentive structure that led to, and motivated, Philips Respironics to develop the PAMS program and use it as an inducement in an illegal kickback arrangement.

87.     Below, the Amended Complaint first describes Medicare's billing codes and coverage for CPAP machines and resupplies. *See* ¶¶ 84-98. Next, the Amended Complaint explains the genesis of the PAMS program and how the program works in practice. *See* ¶¶ 99-110. Thereafter, the Complaint describes with particularity how Philips Respironics provided the PAMS program to select DME suppliers at prices well below fair market value. It even provided PAMS at below cost for targeted DME suppliers who could generate sufficient sales and market share. In this regard, Philips Respironics often targeted DME suppliers who primarily used ResMed products, the Company's main competitor, to try to gain market share from its chief rival. *See* ¶¶ 127-129, 147-150. The Complaint then explains how this conduct constitutes an illegal kickback in violation of the AKS. *See* ¶¶ 116-156.

**1.      Billing Codes for CPAP Machines and Resupplies**

88.     Obstructive sleep apnea ("OSA") is the most common sleep-related breathing disorder. While sleeping, people with OSA repeatedly stop and start breathing because their throat muscles relax during their sleep in a manner that blocks their airways. Two of the biggest risk

factors for OSA are obesity and old age. People over 60 years old have the highest prevalence of OSA.

89.     The most common form of treatment for OSA is the use of a machine that generates continuous positive airway pressure ("CPAP"). Known as a CPAP machine, it delivers continuous air pressure to a sleeping patient's upper airway through a mask that fits over the patient's nose or an air pillow with prongs that fit in a patient's nose. The continuous air pressure generated by the CPAP machine is calibrated to be just strong enough to keep the patient's upper airway passage open during sleep, thus preventing OSA from occurring.

90.     Medicare uses HCPCS billing code E0601 to reimburses DME providers for CPAP devices. CMS classifies CPAP machines as a "capped rental" item. This means Medicare initially covers the CPAP machine as a monthly rental item with a reimbursement rate of approximately $100 per month. However, the DME provider can only bill for the CPAP machine for up to 13 months. After 13 months, Medicare deems the CPAP machine as having been purchased by the patient (who gets to keep the device) and stops reimbursing the DME provider for the item even if the patient continues to use the device. This makes sense as the retail price for a typical CPAP machine is around $1,000.

91.     There are, however, a couple of important caveats to this billing rule. For one, if the patient continues to use the CPAP machine after the 13 months have passed, the DME provider can still bill 1 rental month (approximately $100) every 6 months as a maintenance charge, which they can do for up to 5 years. Also, after 5 years, the DME supplier can bill Medicare for a new CPAP machine if the original device is documented as irreparably damaged.

92.     But, that's not all of the revenue that CPAP machines can generate. DME suppliers (and Philips Respironics) can make significantly more money than they get from the CPAP

machine alone, through the sale of resupplies for the CPAP machines. Here is how it works. A new CPAP machine comes with the following accessories: a nasal mask or pillow; standard tubing that connects the machine to the mask or pillow; a non-disposable filter; a heated humidifier to moisten the air entering the patient's nose, and a humid chamber for holding the water that moistens the air flowing to the patient. Over time, these accessories (supplies) are subject to substantial wear and tear, including a build-up of potential contaminants since these parts are in continuous and direct contact with a patient's breath while the machine is in use.

93.    Accordingly, as long as a CPAP machine continues to be used by a patient, Medicare allows DME suppliers to order replacements of these supplies at varying frequencies. The replacements are often referred to as resupplies in the industry. While resupplies can come from a manufacturer different from the one who sold the CPAP machine, generally speaking, DME suppliers order resupplies from the same Company who made the CPAP machine.

94.    Pursuant to separate HCPCS codes, Medicare pays $21 to replace a nasal mask cushion (resupplies allowed twice a month); pays $63 to replace a nasal mask (resupplies allowed once every three months); pays $7 to replace a non-disposable filter (resupplies allowed once every six months); pays $14 to replace the standard tubing (resupplies allowed once every three months); pays $155 to replace a heated humidifier (resupplies allowed once every six months), and pays $15 to replace a humid chamber (resupplies allowed once every six months). Notably, all of these resupplies, including the heated humidifier, and the frequency with which they can be ordered, are either necessary or highly recommended by the medical profession for the proper use of a CPAP machine.

95.    Adding up all of these resupplies, and assuming the resupplies were all ordered at the allowable frequency, comes to $1,170 per year. The resupplies can continue in this manner for

as many years as the patient continues to use the CPAP machine. Note too, that this reimbursement is in addition to the $1,200 the DME supplier receives from the CPAP machine's capped rental.

### 2. CPAP Coverage Rules and DME Suppliers' Patient Adherence Programs

96.     However, there is a significant hurdle that a DME supplier must overcome to generate the big increase in revenue from ordering resupplies and billing for all 13 months of a CPAP capped rental period. The hurdle arises from the fundamental requirement that all Government Healthcare Programs place on sales or rentals of medical devices: the item must be medically necessary. Under Medicare Part B, for example, Congress expressly prohibits reimbursement "for any expenses incurred for items or services [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury…" 42 U.S.C. § 1395y(a)(1)(A). With respect to CPAP machines and their resupplies, in addition to the statutory requirement of medical necessity, the Government Healthcare Programs have also enacted specific coverage rules designed to help ensure that the CPAP machine is truly necessary.

97.     Toward that end, in 2008, CMS enacted Local Coverage Determination ("LCD") L33718 for CPAP machines and their resupplies. This LCD requires patients to adhere to certain CPAP usage minimums in order for Medicare to continue paying for the CPAP machine after the first three months *and* to be able to order resupplies. This coverage rule states that, to continue billing after the first three months, the DME supplier must confirm that a patient used their CPAP machine for at least 4 hours per night on 70% of the nights during a consecutive 30-day period within the first 3 months of therapy (the "70% criterion"). In practice, the 70% criterion means that the DME supplier must have a record showing that the patient used the CPAP machine for at least 4 hours per night for at least 22 nights (70%) and those 22 nights must fall within any 30-day period within the first 3 months of renting the device. This usage requirement is intended to be a

proxy for medical necessity, *i.e.*, the thinking goes, if a patient can meet the 70% criterion, they must need the machine. Meeting the 70% criterion is also referred to as "patient adherence."

98.     Patient adherence is a crucial metric for CPAP suppliers and manufacturers. If a patient meets the 70% criterion, *then the DME supplier can bill for the full 13 months of the CPAP rental period **and** bill for resupplies for as long as the patient uses the device*. The only coverage limitation left once the 70% criterion has been met is the requirement, also found in LCD L33718, that "[i]f there is discontinuation of usage of a CPAP device at any time, the supplier is expected to ascertain this and stop billing for the equipment and related accessories and supplies." Historically, this limitation has had little effect on DME suppliers' ability to bill for the full 13 months of the CPAP rental period and the ability to bill for resupplies for the first year the patient has the device.

99.     Accordingly, DME suppliers have a huge incentive to ensure their patients meet the 70% criterion. For each patient that meets the requirement, a DME supplier can drastically increase its revenue: from $300 for the first three months if the patient fails to meet the 70% criterion to $2,370 if the patient meets the criterion (and the resupplies are ordered at the allowable frequency). Of course, many patients also continue to use their machines after the first year, which means that patient adherence to the 70% criterion also allows the DME suppliers to continue earning over a thousand dollars per year in resupplies as long as the patient continues to use the machine in following years.

100.     Without any outside assistance, patients generally meet the 70% criterion a little over half of the time. That leaves a large number of nonadherent patients who could generate substantial additional revenue for DME suppliers, if the patients could be coached or trained well enough to meet the 70% criterion. For this reason, most DME suppliers, from the largest to the

smallest, invest considerable resources – time, money, personnel – into efforts to get their patients to meet the 70% criterion.

101.     Smaller DME suppliers often use their own support staff to make phone calls, send emails or text patients to encourage patients to use their CPAP machines. Some small to medium-sized DME suppliers hire extra support staff to perform the same role, sometimes employing sleep specialists who can help patients who are having particular problems adapting to their CPAP machines. Some DME suppliers hire outside phone call centers to bombard patients with phone calls encouraging patients to use their machines. The biggest DME suppliers, not surprisingly, have entire departments devoted to the cause with even more resources such as trained sleep specialists and professional respiratory therapists ("RTs") on call to answer patient questions and coach patients on how to better tolerate their CPAP machines.

102.     Needless to say, these efforts are highly labor intensive and costly. But, given the huge increase in revenue that comes with a patient meeting the 70% criterion, DME suppliers find their patient adherence programs to be worth the cost. If not, DME suppliers would have discontinued their own patient adherence programs years ago.

### 3.     Philips Respironics' Patient Adherence Management Service ("PAMS")

103.     In and around 2016, Philips Respironics developed and launched a program known as the Patient Adherence Management Service ("PAMS"). It was designed to do exactly what the biggest, nationwide DME suppliers do with their adherence programs: speak with, train, coach, encourage patients with emails, text messages, call centers, sleep coaches, and RTs, all in an effort to ensure that the patients of DME suppliers who sign up for PAMS meet the 70% criterion. Soon after PAMS began its operations, it became a highly successful program.

104.     In a sales brochure targeting DME suppliers, Philips Respironics describes its PAMS program as follows (font color and emphasis in original):

**Patient Adherence Management Service (PAMS)** works to motivate and coach patients by providing personalized one-on-one care through live-call coaching and ongoing sleep apnea support during their 90-day acclimation period.

\* \* \* \* \*

PAMS' focus is to improve **adherence rates–as well as the therapy experience of new patients–through:**

- **Patient outreach** includes personalized calls, emails and texts to deliver education, motivational reminders and support from sleep coaches trained in health behavior change.
- **EncoreAnywhere software** to manage workflow and communications with homecare providers, to identify patients struggling with therapy adoption and personalize coaching.

\* \* \* \* \*

How **PAMS works**:

- **PAMS facilitates communication** with your patient through a secure, convenient and effective process to manage your patient's treatment and help you get back your most valuable resource: **Time.**
- **Outreach**
  Our sleep coaches proactively reach out to assist patients:
    • Coach and motivate
    • Assist proper device usage
    • Device/mask education, instruction and training (Post-setup)
    • Assist struggling patients
- **Special care**
  Patients who continue to struggle are escalated to licensed RTs for additional support

105.     In its own words, Philips Respironics describes a comprehensive, labor intensive, high-end effort by employees of Philips Respironics, including RTs, sleep coaches, and call center personnel who actively engage in one-on-one patient care, pursuant to a contract with the DME supplier, to maximize the number of the DME supplier's patients who meet the 70% criterion.

106.     In other portions of the sales brochure, Philips Respironics emphasizes particular benefits the PAMS program provides for DME suppliers. The brochure states:

Proven **success**
- **24%** average relative increase in 90-day compliance rate compared to pre-PAMS adherence rate average.
- **79.5%** of all PAMS patients meet the 90-day CMS compliance guidelines

\*   \*   \*   \*   \*

**Efficient RTs are good for business**

- Patient Adherence Management may help you differentiate your business to win more and *can reduce the burden on your RTs, so you're able to deploy resources more strategically*, and is proven to keep patients adherent and engaged at home—with industry-leading adherence rates.

\*   \*   \*   \*   \*

PAMS users demonstrated a **95% average reduction in time spent, among homecare providers using PAMS for at least six months.**
- Contacting and following up with new patients
- Answering questions from patients about their therapy device and mask
- Motivating patients on adjusting to their new therapy

107.     The sales brochure shows how Philips Respironics promoted the effectiveness of PAMS, asserting that PAMS brings patient adherence rates up to what is an extremely high average of 79.5%. The sales brochure also stresses that PAMS will save the DME supplier *time and effort* because PAMS, the Company says, will "help you get back your most valuable resource: Time." The clear implication here is that PAMS saves the DME supplier time because, without PAMS, the DME supplier's own personnel would need to perform this valuable work.

108.     In addition, the sales brochure specifically points out that PAMS can "reduce the burden on your [the DME supplier's] RTs" so that the DME supplier is able "to deploy resources more strategically." In other words, without PAMS, the brochure claims, the DME supplier's own RTs would have to do much of the patient adherence work. But, with PAMs, Respironics does the patience adherence work, not the DME supplier's RTs.

109.     The sales brochure also claims that PAMS "users demonstrated a 95% reduction in time spent, among homecare providers" (these are staff who work for the DME supplier). The brochure explains how PAMS accomplishes this. Without PAMs, the brochure says, the DME supplier's homecare providers would have to do operational tasks such as "Contacting and following up with new patients," "Answering questions from patients about their therapy device

and mask," and "Motivating patients on adjusting to their new therapy." Again, the clear implication here is that without PAMS, the homecare providers hired by the DME suppliers would have to do this work themselves.

110.    Operationally speaking, PAMS was not an off-the-shelf service that a DME supplier could purchase to generate a higher adherence rate for its CPAP patients. Rather, it was a sales tool devoted solely to increasing sales of Respironics's CPAP products. That is why Respironics limited the PAMS program exclusively to patients using its CPAP machines and resupplies. It did not allow DME suppliers to use PAMS with patients using ResMed products, or that of any other competitor. PAMS was a service designed by Respironics to exclusively generate revenue for Respironics and the DME suppliers it contracted with.

111.    Respironics enforced this exclusivity in the following way. To use PAMS, a DME supplier first entered into a contract with Respironics that included, at least in the beginning, a charge of $55 per patient per month. *See* ¶¶ 121-122, 140-144 for an explanation of the monthly charge and its role in the kickback scheme. Thereafter, if a DME supplier obtained a new CPAP patient, it would enter the patient into the PAMS program and be charged a per patient fee. Under some contracts, as explained below at ¶¶ 124-126, the more a DME supplier used the PAMS program the cheaper the per patient charge became.

112.    Under PAMS, Respironics required the DME supplier to enter the new patient's information into Respironics's proprietary web-based application called EncoreAnywhere or its subsequent, new and improved version, called CareOrchestrator. These apps, among other things, track patient compliance and assist with the ordering of resupplies. Once the patient DME supplier entered the patient's information into EncoreAnywhere or CareOrchestrator, Respironics would

deliver a Respironics CPAP machine to the patient and the PAMS program would begin its intensive patient adherence protocols.

113.    Importantly, once a patient was using a CPAP machine manufactured by Respironics, the patient could only use resupplies made by Respironics. Except for the standard tubing, you can only use Respironics resupplies with Respironics CPAP machines. Respironics's resupplies are not interchangeable with those made by other manufacturers. In this way, once a DME supplier entered a patient into the PAMS program, the patient and the DME supplier were tied to a Respironics CPAP machine and Respironics resupplies for the life of the machine.

114.    EncoreAnywhere and CareOrchestrator were vital components of both the PAMS program and Respironics's proprietary resupply program called medSage. PAMS, medSage, EncoreAnywhere, and CareOrchestrator all worked together to enhance patient adherence, track patient adherence, track when a patient could order new supplies; they even ordered and shipped the resupplies from Respironics directly to the patient. In the end, all the DME supplier had to do was bill the insurer, including the Government Healthcare Programs, for the resupplies. For this service, the DME supplier was *required* to use Respironics's CPAP machines and resupplies, and was charged, at least in the beginning, a fee of $55 per patient per month.

### 4.    Prior Related DOJ Settlement and the Genesis of the PAMS Program

115.    The PAMS program arose from an earlier, pre-2016, Philips Respironics program known as Fit for Life; a program similar to PAMS. Like PAMS, Fit for Life was an in-house program designed to help DME suppliers improve patient adherence outcomes to generate additional revenue from the sale of resupplies and reaching the 13-month cap on CPAP rentals. Fit for Life did this through a call center that contacted patients, checked for patient compliance, and helped the DME suppliers automatically generate new resupply orders. Philips Respironics offered this program for free to DME suppliers, as long as they ordered Philips Respironics' products.

116.     The Fit for Life program was not nearly as intense and comprehensive as PAMS; it was basically just a call center, and a much smaller one than PAMS utilized. It also lacked the costlier professionals that PAMS employs, such as the RTs and sleep coaches, that were so helpful to the success of the PAMS program. Nevertheless, Fit for Life was wildly successful generating hundreds of millions of dollars in extra revenue for the Company's DME suppliers and Philips Respironics.

117.     The program ended, however, in late 2015, as a result of a $34.8 million settlement with the DOJ. The settlement resolved an FCA case alleging that Fit for Life's free services were an illegal kickback in violation of the AKS and the FCA. The DOJ press release announcing the settlement describes the conduct this way:

> The United States alleged that Respironics violated the Anti-Kickback Statute and the False Claims Act by providing free services to DME suppliers to induce them to purchase Respironics masks that treat sleep apnea. Respironics allegedly provided DME companies with call center services to meet their patients' resupply needs at no charge as long as the patients were using masks that Respironics manufactured; otherwise, the DME companies would have to pay a monthly fee based on the number of patients who used masks manufactured by a competitor of Respironics. The government alleged that the conduct began in April 2012 and continued until November 2015.[6]

118.     The DOJ settlement put an end to the Fit for Life program, but that did not deter Respironics from developing another patient adherence program. Fit for Life was simply too successful, too profitable, for the Philips Defendants to drop it altogether. Accordingly, a few months after the March 2016 DOJ settlement, Respironics launched the PAMS program, described above and throughout much of the Amended Complaint.

---

[6] DOJ, Respironics to Pay $34.8 Million for Allegedly Causing False Claims to Medicare, Medicaid and Tricare Related to the Sale of Masks Designed to Treat Sleep Apnea (Mar. 23, 2016), *available at* https://www.justice.gov/opa/pr/respironics-pay-348-million-allegedly-causing-false-claims-medicare-medicaid-and-tricare.

119.    Below, the Amended Complaint alleges with particularity how the PAMS program, like the earlier Fit for Life program, amounts to an illegal kickback arrangement in violation of the AKS and the FCA. *See* ¶¶ ¶¶ 116-156.

**5.    The PAMS Program Amounts to an Illegal Kickback Arrangement**

120.    The AKS prohibits paying remuneration to a person to "induce" them to "order," "purchase," or "lease" a product that is paid for by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(2). Applied to the present case, this means the Relator must show that Respironics provided remuneration, in the form of a valuable service, to DME suppliers through the PAMS program to induce them to purchase Respironics's CPAP machines and resupplies that were paid for by a Government Healthcare Program.[7]

121.    The $34.8 million settlement in 2016 was based on a finding by the DOJ of just such a kickback arrangement. As part of the settlement, DOJ alleged that 1) Fit for Life was remuneration, because the patient adherence and resupply program was a valuable service that Respironics provided to the DME suppliers for free, and 2) Respironics provided the service for free to induce DME suppliers to purchase resupplies and CPAP machines from Respironics.

122.    Similarly, in the present case, Relator will show that PAMS amounted to remuneration under the AKS because it was provided to DME suppliers at a price that was below fair market value, and, in telling circumstances, below Respironics's cost for the PAMS service. Relator will also show that the PAMS program was provided at below fair market value and below cost to induce DME suppliers to purchase resupplies and CPAP machines from Respironics rather than its competitors, in particular to gain market share from ResMed.

---

[7] As for this last point, it boggles the mind to think that Respironics would argue that none of its sales of CPAP machines and resupplies generated by the alleged kickback scheme were paid for by a Government Healthcare Program. Historically, Medicare and Medicaid have been the source of a substantial percentage of Respironics CPAP revenue.

a. **Respironics repeatedly Lowered the Price of Its PAMS Program for Select DME Suppliers to Induce them to Purchase Greater Quantities of Respironics CPAP Products**

123.     If a seller of medical equipment offers a potential buyer of medical equipment (*i.e.*, a referral source) a service at below fair market value, it qualifies as *remuneration*, something of value, under the AKS. If the seller offered the service at below fair market value to induce the purchase of the seller's product it is an illegal kickback. For example, if a seller of neck and back braces offers to provide a physician's practice with a receptionist for $10 per hour when the going rate for a receptionist in the area is $25 per hour (with the brace seller paying the $15 difference) that is remuneration, something of indisputable value to the physician's practice: an inexpensive receptionist. If the seller provides this remuneration to induce the physician's practice to purchase its neck and back braces, then the remuneration amounts to an illegal kickback under the AKS.

124.     With its PAMS program, Respironics engaged in a kickback scheme much like this hypothetical: offering a valuable service at a price below fair market value. Relator worked at Respironics for over 10 years, from June 2011 until December 2021. Relator worked in CPAP sales from the time the PAMS programmed launched in 2016 until he left Respironics. What he saw firsthand and learned from documents he reviewed while working at Respironics is that the per patient price of the PAMS program was not static. There was no one price for the service. Rather, the price was set per contract, usually through negotiations with the DME supplier. The price Respironics gave the DME supplier for PAMS was directly related to how much additional revenue the sales rep and the Sales Department believed the DME supplier could generate.

125.     The original price for the PAMS program, when it first launched, was $55 per patient per month. But, Relator observed that very quickly, due to pressure from the Sales Department, the price quickly dropped based on the opportunity the particular DME supplier presented to Respironics for increased sales and market share. For example, as Relator saw with

some of his own customers (DME suppliers) and customers of other sales personnel, if a DME supplier was a long-time purchaser of Respironics CPAP products and was happy with the PAMS program at $55 per patient, then there was no incentive to change the price, so the Sales Department set and kept the price at $55 per patient.

126. Another typical situation, one routinely observed by Relator, arose when a DME supplier who had been a good customer balked at the $55 dollar per patient fee. Often, such a customer was happy with his own patient adherence efforts and did not see the need to pay the extra fee. In that situation, the Sales Department would attempt to negotiate a lower PAMS price – *a price lower than what the DME supplier was already paying, either in-house or outsourced, for patient adherence* – to keep and grow the Respironics business generated by this customer.

127. Under PAMS, once a DME supplier had a PAMS contract and a patient was put into the system, the CPAP machines and resupplies were guaranteed to go to Respironics. *See* ¶¶ 108-109. If the DME supplier continued to run his own patient adherence program, however, the supplier could pick and choose which CPAP manufacturer to use. Accordingly, in this situation, the Sales Department had a strong incentive to lower, and did lower, the PAMS price to get the DME supplier to sign or resign a PAMS contract. Similarly, Relator saw firsthand how the Sales Department worked hand-in-hand with the sales reps and the DME suppliers to negotiate the price of the PAMS program to below the price the DME supplier was already paying for patient adherence, but **only** if the Sales Department felt that the DME supplier had a good potential to increase sales and gain market share for Respironics.

128. In these situations, which the Relator saw more and more frequently as the PAMS program grew, the Sales Department at first approved contracts at the lower price of $45 per patient, and then $35 per patient, and eventually $25 per patient. The lowering of the PAMS price

was always done, Relator observed, to induce DME suppliers to join or remain in the PAMS program; to increase sales from a particular DME supplier; or, when the opportunity presented itself, to increase market share by switching ResMed customers into Respironics customers.

129.    Throughout this time, Relator observed that Respironics did not seem worried that a low price was below the cost of running the PAMS program. That was because the resupplies generated from PAMS were worth much more than any loss on running the PAMS program. In fact, Relator learned from his colleagues at Respironics that PAMS was incredibly successful; it brought in hundreds of millions of dollars in additional revenue from resupplies, despite the absurdly low prices offered to certain DME suppliers. Remember too, Respironics was willing to give the similar Fit for Life program to DME suppliers for free, and that program, although free, was also wildly successful at generating increased revenue for Respironics.

130.    As with most kickback schemes where corporate healthcare providers are involved, the push to lower PAMS pricing came from the Sales Department. As noted above, it was the Sales Department who worked with the sales reps to negotiate the PAMS contracts and it was the Sales Department that approved and signed all of the PAMS contracts.

131.    During Relator's time at Respironics, Jamie Caputo, a National Director of Sales, was in charge of the PAMS program. He was also responsible for approving and signing all of the PAMS contracts. Caputo was also heavily involved, along with the sales reps, in negotiating the PAMS contracts. Caputo was the one who gave final approval for the price used in all of the PAMS contracts. In his role as head of the PAMS program, Caputo personally approved lowering the price in select PAMS contracts to $45, then $35, then even $25 in particular contracts that showed great promise for increased CPAP revenue. Eventually, Relator learned while working at Respironics, that Caputo many times approved PAMS contracts with a price as low as $15 per

patient when the Sales Department deemed it necessary to do so to keep a DME supplier from switching to ResMed or when they felt they could use a very low PAMS price to induce a DME supplier who used ResMed to switch to Respironics.

132.    Relator often worked closely with Caputo negotiating PAMS contracts and discussing strategies on how to use PAMS to generate additional sales. Relator recalls one particular PAMS contract negotiation, in September 2020, that exemplifies all of the reasons why Relator alleges Respironics used the PAMS program as an illegal kickback.

133.    In this instance, Relator and Caputo were negotiating with a DME supplier in the Relator's sales territory who was a loyal Respironics customer. The problem was that Relator had learned the DME supplier was on the brink of switching to ResMed. Relator and Caputo first tried to entice the DME supplier to stay with Respironics by offering it a PAMS contract at $25 per patient, but the customer would not accept it.

134.    Thereafter, through a series of text messages between Caputo and the Relator, Caputo approved offering PAMS to the DME supplier for $15 per patient to seal the deal. In one text, the Relator tells Caputo "We need to stress with him [the DME supplier] how many calls we make, the average call time spent, the compliance average . . .  He is trying to justify it over paying his own person now." Caputo texts, "Got you. You quoted $15 PAMS?" to which Relator replies "Yup," and in response Caputo texts to Relator the thumbs up emoji.

135.    Later in the conversation, Caputo texts "I'm still fine offering $15 for PAMS. Just want to be on the same page." Relator then asks, "Do you happen to know the average touches each patient gets [with PAMS] on average? I would also let him know that we touch the patient more than what his one rep could." Caputo replies that "we're making 2 live call attempts each time. Last I saw was 7+." Relator replies, "Wow. That's incredible we average 7 touches. Way

more than his one RT is doing I'm sure." Caputo says, "That's calls." To which Relator says "7 calls average!?!?! Yeah I would stress that with him."

136.    Based upon observations and conversations he had while working at Respironics, Relator alleges that a PAMS price of $15 per patient is not only below fair market value, it is also below the per patient cost to Respironics to run PAMS. Taking that allegation as true, the negotiations with this particular DME supplier represent a clear-cut example of an illegal kickback. Respironics offered a valuable service, the PAMS program, at below fair market value, even below cost, to induce the DME supplier to purchase Respironics CPAP products.

137.    Note too that the negotiation is all about Respironics offering a high-end, intensive, and comprehensive patient adherence program at below fair market value. This particular DME supplier had been using a rep or an RT to perform its own in-house patient adherence program. The negotiation over the price of the PAMS program is focused on Respironics offering the DME supplier a superior patient adherence program at a price lower than what the supplier would have to spend on its own RT performing an inferior patience adherence program. It is also below the price that the DME supplier would pay on the open market for such a valuable service.

138.    Put another way, the fair market value for the PAMS program is the price that a DME supplier would pay to either perform the service in-house or purchase the service on the open market in an arms-length negotiation. The negotiation here between the DME supplier and Respironics is all about offering a superior patient adherence program at a price lower than what this supplier could do in-house or on the open market. Accordingly, this is an example of a kickback arrangement wherein Respironics is offering a valuable service at a price that is below fair market value, *i.e.*, something of value because it is offered at a price cheaper than the open

market, with the intent to induce the DME supplier to purchase more Respironics CPAP machines and resupplies.

      **b.**    **Respironics used addendums to PAMS contracts to drastically lower the price of PAMS for certain targeted DME suppliers**

139.    In addition to the standard contracts with a set price per patient for PAMS, Respironics also used addendums to PAMS contracts that provided aggressive price-lowering terms to certain targeted DME suppliers. How Respironics used contract addendums to administer kickbacks can perhaps be illustrated best by describing an addendum that the Relator helped to negotiate with Caputo and a DME supplier in Relator's territory called At Home Health Equipment ("AHHE"). AHHE had a PAMS contract with Respironics but dropped it, AHHE claimed, because the cost of the PAMS program was too high. After AHHE terminated its PAMS contract, the Sales Department, including Caputo, believed AHHE planned to switch to ResMed to purchase its CPAP products going forward.

140.    To induce AHHE to stay with Respironics, the Sales Department negotiated an addendum to the PAMS contract, approved by Caputo, that worked as follows. Instead of a set price per patient, the addendum provided a price of $30 per patient for 50 new patients per month, a fee of $1,500 per month if AHHE met the goal of 50 new patients. If AHHE failed to meet the goal of 50 new patients, it still owed the $1,500 per month fee. Thus, on its face, the addendum appeared to be an incentive for AHHE to meet the goal of 50 new patients per month so it could receive the low price of $30 per patient for the PAMS program.

141.    But the arrangement was deceptive for two reasons. First, Respironics Sales Department intentionally set the goal of 50 new patients at an artificially low number. AHHE had a much bigger patient base than the 50-patient goal implied. The Sales Department knew from its prior experience with AHHE and from its negotiations with AHHE, that it was a large enough

DME supplier to bring in 100 or more new patients per month if it re-joined the PAMS program. Second, the $1,500 per month fee was a maximum under the contract. For each new patient that AHHE brought into PAMS over the goal of 50 new patients, AHHE received PAMS for free for that patient. That is precisely how the Sales Department sold the addendum to AHHE: for the first 50 new patients, you will receive PAMS for $30 per patient, and for every new patient above 50 per month, you will receive PAMS for free. Another way of looking at it is to say that each new patient over the 50-patient total reduced the blended price below $30 per patient. Thus, for example, if AHHE brought in 100 new patients per month, it paid $1,500 or $15 per patient.

142.    The AHHE addendum amounted to an illegal kickback because 1) for every new patient over the artificial goal of 50 new patients, Respironics gave PAMS to AHHE for free, and 2) the blended rate for PAMS when it exceeded the artificial goal of 50 new patients, was less than $30 per patient – a rate below fair market value and often below cost for Respironics.

143.    During his employment at Respironics, Relator observed other addendums to PAMS contracts that contained the same deceptive terms, conduct that, as explained above, amounted to illegal kickback arrangements.

c.    **Respironics Gives Something of Value, Remuneration under the Terms of the AKS, when it Provides DME Suppliers with the PAMS Program at Prices Below Fair Market Value**

144.    As described above, if Respironics offers its valuable service, the PAMS program, to a DME supplier at a price that is below fair market, then Respironics is offering something of value, *i.e.,* remuneration, under the terms of the AKS. If it offers PAMS at below fair market value to induce sales, then it is an illegal kickback. Respironics has provided its PAMS program from $55 to $15 and everything in between. It begs credulity to think that all of those prices are at or above fair market value for the intense and comprehensive patient adherence program known as

PAMS. It is simply unbelievable to think that offering PAMS at $15 per patient – an almost 75% reduction from Respironics's original price of $55 – is at or above fair market value.

145.     Under the AKS, fair market value in the present case is the price that a DME supplier would have to pay to purchase a high-end patient adherence program as good as the PAMS program on the open market in an arms-length negotiation. Upon information and belief, Respironics never performed an expert economic analysis to determine what is a fair market value price for its PAMS program. In any event, Philips should already know that even a price of $55 is below fair market value because the Company knows what it charges on the open market, in arms-length transactions, for similar (but much less intensive) services: prices well above $55.

146.     For example, the Philips Defendants work with a company called InHealth that helps Philips and other DME suppliers monitor patients already on Philips' equipment (not CPAP machines) to ensure continued compliance with their healthcare provider's prescription. Philips markets InHealth's service to healthcare providers for preventive billing and chronic care codes and in return InHealth will monitor patients on Philips' products to ensure compliance. For this service, InHealth bills approximately $100 per call to the patient.

147.     Additionally, Respironics offers something it calls the Home Delivery Remote Set-Up service ("HDRS"). HDRS provides patients with a complete sleep apnea setup kit at their doorstep. It contains consumer-friendly packaging and detailed instructions to make it easy for the patient to start therapy on their own. HDRS also provides patients with step-by-step instructions over the phone or online with a licensed RT. The price for this service is set based on an arms-length negotiation at $65-$80. That price includes an estimated $6-$10 shipping rate that Philips has with FedEx, however, the rest of the fee is for one phone call lasting approximately forty-five minutes.

148.    Compare these examples with a price of $55 to $15 for PAMS, a much more comprehensive service that, among other things, averages seven phone calls per patient, utilizes sleep coaches, a patient monitoring system, a comprehensive web-based app for tracking patient compliance, free shipping and delivery of the patient's CPAP machine and resupplies, and on-call RTs and sleep specialists that patients can call anytime as many times as they want.

149.    Also, point out that HHS-OIG considers contracts such as the ones that Respironics has with DME suppliers "inherently suspect" requiring "heightened scrutiny" for possible kickback violations. For example, if a DME supplier selling neck and back braces enters into a contract with a doctor's office to rent space from the doctor, it is considered "inherently suspect" because the DME supplier may pay a price well above fair market value to rent the space from the doctor to induce the doctor's office to purchase the DME supplier's braces. Here, the PAMS contract involves a healthcare provider Respironics selling a service called PAMS to a different healthcare provider, the DME supplier, where the DME supplier can generate business for Respironics. In this scenario, price reductions on PAMS can easily be used as a kickback to generate new sales from the DME supplier to the benefit of Respironics, so it is "inherently suspect" on its face and requires "heightened scrutiny."

        **d.**        **Using the PAMS program as an illegal kickback was done throughout the Company, and it was pushed, promoted and condoned by Respironics Sales Department**

150.    Relator worked in sales at Respironics from June 2011 until December 2021. During that time, he saw the adoption of the Fit for Life program and saw firsthand how it was used as a kickback to generate CPAP sales. He worked there during the settlement of the earlier FCA case and the launch of the PAMS program in 2016. And, he worked in the Respironics sales department selling CPAP machines and resupplies from 2016 until December 2021, a time when PAMS was used to generate hundreds of millions of dollars in revenue for Respironics.

151.    During his lengthy time selling CPAP products for Respironics, Relator observed one constant and consistent theme coming from the Company's Sales Department: Use the patient adherence programs, Fit for Life and then PAMS, and use free CEUs to increase CPAP sales and gain market share.[8] "Use low PAMS pricing and free CEUs" to generate sales was a mantra throughout the Respironics Sales Department. It was not a one-off suggestion by some sales managers in certain parts of the country. It was a company-wide, top-down directive from management in the Sales Department to use low PAMS pricing and free CEUs to maintain sales, increase sales, and grab market share from ResMed. It was discussed constantly at sales department meetings, both regionally and nationally. Relator recalls that the use of PAMS and free CEUs was especially prevalent – and pushed hard by management – when Respironics was trying to gain market share from ResMed.

152.    For example, Relator recalls a conference call, sometime in the 2017 to 2020 time frame, attended by all of the Company's Regional Sales Managers.[9] The head of the PAMS program, Jamie Caputo, a National Sales Director, spoke on the call. Caputo discussed a game plan with the Regional Managers for increasing CPAP sales. The key, Caputo stressed, was to offer PAMS at lower and lower prices to generate new sales and gain market share. Caputo also

---

[8] How Respironics used free CEUs to generate sales and gain market share in violation of the AKS is explained below at ¶¶ 157-175. In short, professional staff at DME suppliers and referral sources for DME suppliers, such as physician practices, have Continuing Education requirements they must periodically meet. Respironics provided lectures and training sessions that qualified as Continuing Education Units ("CEUs") for free to certain DME suppliers and their referral sources. Not all DME suppliers received the free CEUs. Rather, the Sales Department controlled the use of the free CEUs, giving them for free to DME suppliers who, the Sales Department believed, could be induced to increase their sales of CPAP machines and resupplies and to gain market share away from ResMed. It was, as the Relator learned from Respironics management, a straight kickback arrangement: I will give you free CEUs if you will continue to use, or increase your use of, Respironics CPAP products.

[9] Relator's regional manager, his boss, told him all about the call after it was over.

highlighted the effectiveness of using aggressively low PAMS prices with one particular target group: DME suppliers who predominantly used ResMed CPAP products. Low prices on PAMS, Caputo believed, was a great way to switch these DME suppliers to Respironics.

153. From 2015 to 2021, when he left Respironics, Relator was a sales rep in Region C, a territory that covered Illinois, Indiana, and part of Missouri. Gary Hawkins was the Regional Manager for this territory from 2014 until he was fired in July 2019. Thereafter, Sherri Talenko became the new Regional Manager and stayed in that position until at least 2021 when Relator left the Company.

154. Relator recalls a Regional sales meeting, done via a conference call sometime in the 2017 to 2020 time frame, that was led Gary Hawkins, the Relator's Regional Manager. Relator and his fellow sales reps in Region C participated in the meeting. Caputo also attended this particular Regional sales meeting and Relator remembers Caputo emphasizing that they could all go as low as $15 per patient on their PAMS contracts, when necessary. The sales reps all understood what "when necessary" meant: If you need to go as low $15 to keep a DME supplier on PAMs or if you have an opportunity to generate additional sales or move market share away from ResMed with a $15 contract, then Caputo would approve it.

155. Relator describes his direct boss, Regional Sales Manager Gary Hawkins, with whom Relator worked closely for four long years, as the worst kickback offender he knew of in the Company. Relator describes the many Regional sales meeting run by Hawkins as a non-stop advertisement for use of $15 PAMS pricing to generate sales and market share. When a sales rep was having trouble getting into an account, Hawkins would invariably coach them to use low pricing on PAMS and free CEUs to get the DME supplier on board.

156.    Relator also describes Hawkins as a massive proponent of using free CEUs to boost sales. Hawkins considered free CEUs as the biggest and most important tool that sales reps could use to induce DME suppliers to purchase more CPAP products. Hawkins considered them a valuable currency that should be doled out as much as needed to generate sales.

157.    As for Sherrie Talenko, Hawkins's successor as Regional Sales Manager, Relator recalls that Talenko did not push PAMS pricing as much as Hawkins, but she certainly condoned and approved of its use to generate sales. On the other hand, Relator recalls Talenko as being a big proponent of using free CEUs to boost sales.

158.    Relator alleges that using low PAMS pricing and free CEUs as a kickback to increase sales and gain market share was a company-wide kickback problem at Respironics. He learned that from working with Caputo (a National Sales Director) on many PAMS contracts and discussions with him, including meetings where Caputo was speaking. He also learned it from sales reps in other Regions whom he frequently met during his time at Respironics. He also learned it from reviewing posts by members of the sales department on Salesforce, a web-based sales communications network used by Respironics. Specifically, many posts by Respironics employees discuss how valuable the free CEUs were to generating sales of CPAP products.

159.    He also learned that the use of low PAMS pricing and free CEUs was a nationwide problem from conversations with Hawkins. Hawkins would sometimes return from Regional Sales Managers meetings (nationwide meetings of all Respironics Regional Managers) with stories about how much other Sales Regions were using low PAMS pricing and free CEUs to generate revenue, chiding the sales reps to step up their use of these sales tools even more.

160.    Relator recalls one such instance in particular where Hawkins returned from a Regional Sales Managers meeting and complained to the sales reps about the fact that other

Regions were utilizing more free CEUs, and generating more business from them, than their Region was doing. Hawkins's take away from this Regional Managers meeting was that his Region needed to push free CEUs even more than they were already doing to increase sales and gain market share.

**B.      The Free CEUs Kickback Scheme**

161.    DME suppliers of CPAP machines often employ professional respiratory therapist (RTs) and sleep technicians to help the DME suppliers' patients with, among other things, the proper use of their equipment, monitoring the progress of a patient's therapy, and patient adherence issues.

162.    These professionals are required to meet annual continuing education requirements to maintain their licenses. Continuing Education Units ("CEUs") are credits that the RTs, sleep technicians, and other professionals working for the DME suppliers earn when they attend accredited training sessions, classes or courses.

163.    But, attending accredited courses to earn CEUs is not free. The RTs, sleep technicians, and other professionals employed by DME suppliers have to pay for these classes out of their own pocket.

164.    Referral sources are also an important part of the free CEUs kickback scheme. In the present context, referral sources are the doctor's offices, physician practice groups, sleep labs, etc., who can refer patients to a DME supplier for a CPAP machine. Not surprisingly, DME suppliers invest much time and effort into cultivating relationships with referral sources to generate patient referrals. Interestingly, according to the Relator, many referral sources are indifferent as to which CPAP machine a patient receives: a Respironics or a ResMed device. The DME supplier's referral sources also employ professionals who must meet annual continuing education requirements, *i.e.*, they need CEUs too.

165. For years, Respironics has either used its own resources and personnel to provide accredited continuing education courses or it has paid outside entities to provide the accredited courses. Either way, the courses provide valuable CEUs to the professionals who are invited to attend them. It is well known inside and outside of Respironics that the Company provided these accredited continuing education courses to professionals in the respiratory and sleep therapy field, courses that would provide the attendees with CEUs. Furthermore, it is well known and undisputed that Respironics provides these continuing education courses for free. Respironics never charges for the continuing education courses that it presents or that it pays another entity to present.

166. Looking at the bigger picture, it does not matter who develops or presents the continuing education courses or whether they are presented in person or online. What matters is that (i) Respironics pays an outside entity or uses its own resources and personnel to present the accredited continuing education courses, and (ii) Respironics provides its accredited continuing education cases for free to those professionals who are invited to participate.

167. This conduct alone does not amount to an illegal kickback. For it to be an illegal kickback, Relator must also prove that Respironics used the free continuing education courses (the free education courses are referred to throughout the Amended Complaint as simply "free CEUs") to induce DME suppliers and referral sources to purchase Respironics CPAP machines and resupplies.

168. HHS-OIG has an advisory opinion directly on point holding that providing a free continuing education course to a referral source is a kickback if the intent in providing the free CEUs was to generate business from the referral source.[10]

---

[10] *See* HHS-OIG, *Advisory Opinion 22-14* (June 23, 2022), *available at* https://oig.hhs.gov/compliance/advisory-opinions/22-14/.

169.     Evidence of the intent on the part of Respironics to use free CEUs as a kickback follows. First, a big reason free CEUs were such a successful sales tool for Respironics is because the staff at the DME suppliers and referral sources absolutely loved them. Securing your annual requirement of CEUs can be a chore for any professional who has to meet such a requirement. Here, a staff member of a DME supplier or referral source could get a portion of their continuing education not just for free, but usually by simply attending an event at their place of work. It was a simple (Respironics made sure of that) and easy way to get some CEUs. Because the staff loved the free CEUs, not surprisingly the DME suppliers and referral sources also highly valued them. Happy staff members make for a good workplace environment.

170.     Second, and perhaps most importantly, Respironics did not offer its free CEUs to the public at large. For example, Respironics did not decide to pay for a continuing education course in a particular geographic area and then invite all RTs and sleep technicians in the area to attend. Rather, *invitations to attend the free continuing education courses were given out solely at the discretion of the Respironics Sales Department*. The Company's sales reps and Regional Sales Managers with input from National Sales Directors, chose, strategically, which DME suppliers and referral sources would receive free CEUs. The decision was based on only one benchmark: whether the free CEUs would lead to increased sales of the Company's CPAP machines and resupplies or whether it would help Respironics gain market share away from ResMed. Once a decision was made to give a free continuing education course for a particular DME supplier or referral source, the DME supplier or referral source could invite as many people as they wanted to attend the free course.

171.     Relator describes the use of free CEUs in his Region as follows. Relator's Regional managers, Gary Hawkins and Sherri Talenko, told him and the other sales reps in their Region, to

use CEUs to drive sales for new customers and to grow or maintain revenue from their existing customers (DME suppliers). Using free CEUs to increase revenue was mandatory for all sales reps in his Region. Relator's managers gave these directives to the sales reps verbally throughout the sales quarter.

172.    Relator asserts that, once a continuing education course was scheduled, there was no limit to the number of invitations that he, the DME supplier, or the referral source could offer to attend it. Every sales member used the CEU program to earn sales bonuses and pad their income. Relator's managers stated that free CEUs was a successful program for generating new business throughout the Company.

173.    Relator also explains that sales reps in his Region would often co-market with DME suppliers to provide free CEUs to their referral sources on their behalf in order to drive increased sales for the DME supplier, who would then use Respironics CPAP products. Relator and the other sales reps would often approach DME suppliers with a proposal to offer a free continuing education course for one of the DME supplier's referral sources, a doctor's office or sleep lab that referred business to the DME supplier. In this manner, the professional staff who worked for the referral sources would receive free CEUs.

174.    The sales reps were expected to follow up with the DME supplier to see if any new patient referrals came to the supplier after presenting a continuing education course to a referral source. If there were, the sales team considered it a "win" and would talk about it with teammates to show the value of free CEUs. Overall, Relator asserts that free CEUs were a highly successful sales tool in his Region. They are also an illegal kickback, not only to the DME suppliers, but to the referral sources as well.

175. For example, in June 2016, the Respironics Sales Department presented a free CEU event at the University of Pittsburgh Medical Center ("UPMC") for lab technicians who worked there. UPMC was a large potential referral source for MedCare Equipment Company, a DME supplier in the area. Respironics sales reps in Pennsylvania worked directly with MedCare Equipment to plan the free CEU event at UPMC. The goal was to provide a large number of free CEUs to the UPMC lab technicians as a way to generate new patient referrals to MedCare Equipment, and thus new sales for Respironics.

176. Other examples of free CEUs being used by Respironics to generate sales include, on April 16, 2020, the Respironics Sales Department gave a free online CEU course for numerous AdaptHealth RTs "from across the United States." AdaptHealth is a nationwide DME supplier and the Respironics Sales Department intended the many free CEUs given to its RTs as a way to generate new business for Respironics from AdaptHealth.

177. On June 3, 2020, Respironics gave a free CEU presentation for clinicians who worked for Rotech in upstate New York. Rotech is one of the largest respiratory DME suppliers in the United States. Rotech was already a large purchaser of Respironics CPAP products and the Respironics Sales Department intended the free CEUs as a way to help maintain and grow its sales to Rotech.

178. On April 23, 2020, Respironics gave a free online CEU presentation for clinicians who worked for Rotech in Michigan and Indiana. The Respironics Sales Department intended the free CEUs as a way to help maintain and grow its sales to Rotech.

179. On November 1, 2017, Respironics gave a free online CEU presentation via WebEx for over 150 clinicians who worked for Rotech throughout the United States. The Respironics

Sales Department presented this large number of free CEUs to Rotech as a way to help maintain and grow its business with them.

180.    On October 29, 2019, Respironics gave a free CEU presentation to staff who worked for Advocate Healthcare to generate new business for Respironics.

181.    On August 22, 2018, the Respironics Sales Department had a meeting with a team of managers who worked for AeroCare Holdings, Inc., a large DME supplier. The purpose of the meeting was to identify targeted referral sources for free CEU events. A follow up free CEU event with AeroCare on November 7, 2018, successfully generated new business from a Baylor Scott & White medical center.

182.    On October 26, 2018, Respironics gave a free in-person CEU course for RTs who worked for Apria Healthcare, one of the largest respiratory DME suppliers in the United States. The Respironics Sales Department intended the free CEUs as a way to try to gain market share from ResMed, as Apria used mostly CPAP equipment manufactured by ResMed.

## CAUSES OF ACTION

### COUNT I
### Submission of False Claims -31 U.S.C. § 3729(a)(1)(A)

183.    Relator incorporates by reference Paragraphs 1 through 182 above as if fully set forth in this Paragraph.

184.    Based on the facts alleged above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

185.    If the Federal Health Programs had been fully aware of Defendants' improper practices alleged above, those programs would not have reimbursed Defendants' claims for reimbursement.

186.     By reason of the false or fraudulent claims that Defendants knowingly presented, or caused to be presented, for payment or approval, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT II**
**False Records and Statements - 31 U.S.C. § 3729(a)(1)(B)**

187.     Relator incorporates by reference Paragraphs 1 through 182 above as if fully set forth in this Paragraph.

188.     Based on the facts alleged above, Defendants made or caused to be made fraudulent and false statements with actual knowledge of the falsity of their statements, with deliberate ignorance of the falsity of their statements, or with reckless disregard as to the falsity of their statements.

189.     The false statements made by Defendants had a tendency to influence and were capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

190.     By virtue of the falsity of the records, statements, and claims made or caused to be made by Defendants, the United States has paid and continues to pay for claims that are false or fraudulent.

**COUNT III**
**Conspiracy -31 U.S.C. § 3729(a)(1)(C)**

191.     Relator incorporates by reference Paragraphs 1 through 175 above as if fully set forth in this Paragraph.

192.     In violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired with one another to commit violations of the False Claims Act, including the violations in Count I and Count II described above.

193. Through the conduct described in this Complaint, Defendants reached an agreement to commit violations of the False Claims Act, including the violations in Count I and Count II described above, and committed overt acts toward the commission of such violations.

194. Defendants' conspiracy had a natural tendency to influence and was capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

195. By virtue of Defendants' conspiracy, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT IV
### Reverse False Claims - 31 U.S.C. § 3729(a)(1)(G)

196. Relator incorporates by reference Paragraphs 1 through 182 above as if fully set forth in this Paragraph.

197. In violation of 31 U.S.C. § 3729(a)(1)(G), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decrease an obligation to pay or transmit money to the United States.

198. The false records and statements made by Defendants had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

199. By virtue of the false records and statements made by Defendants, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT V
### California False Claims Act - Cal. Gov't Code § 12651(a)

200. Relator incorporates by reference Paragraphs 1 through 182 above as if fully set forth in this Paragraph.

201.    This is a civil action brought by Relator on behalf of the State of California against Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

202.    This is a claim for treble damages and penalties under the California False Claims Act. Cal. Gov't Code § 12651(a).

203.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of California or its political subdivisions, false or fraudulent claims for payment, in violation of Cal. Gov't Code § 12651(a)(1).

204.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved in violation of Cal. Gov't Code § 12651(a)(2).

205.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

206.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of California by inducing it to approve and pay false and fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(3).

207.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the State of California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

208.     The State of California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

209.     As a result of Defendants' conduct, the State of California has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT VI
## Colorado Medicaid False Claims Act - Co. Rev. Stat. § 25.5-4-303.5

210.     Relator incorporates by reference Paragraphs 1 through 175 above as if fully set forth in this Paragraph.

211.     This is a civil action brought by Relator, on behalf of the State of Colorado, against Defendants pursuant to the State of Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2)(a).

212.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act. Colo. Rev. Stat. Ann. § 25.5-4-305(1)

213.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(a).

214.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims for payment or approval to an officer or employee of the State of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(b).

215. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(f).

216. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Colorado by inducing it to approve and pay false and fraudulent claims, in violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(g).

217. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(f).

218. The State of Colorado, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

219. As a result of Defendants' conduct, the State of Colorado has been damaged, and

continues to be damaged, in an amount to be determined at trial.

## COUNT VII
### Connecticut False Claims Act - Conn. Gen. Stat. § 4-275(a)

220.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

221.    This is a civil action brought by Relator, on behalf of the State of Connecticut, against Defendants pursuant to the State of Connecticut False Claims for Medical Assistance Programs, Conn. Gen. Stat. Ann. § 4-277(a).

222.    This is a claim for treble damages and penalties under the Connecticut False Claims Act. Conn. Gen. Stat. Ann. § 4-275(b)(2).

223.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under medical assistance programs administered by the Department of Social Services of the state of Connecticut, in violation of Conn. Gen. Stat. Ann. § 4-275(a)(1).

224.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims for payment or approval under medical assistant programs administered by the Department of Social Services of the state of Connecticut, in violation of Conn. Gen. Stat. Ann. § 4-275(a)(2).

225.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used,

or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state under medical assistance programs administered by the Department of Social Services of the state of Connecticut, in violation of Conn. Gen. Stat. Ann. § 4-275(a)(7).

226.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Connecticut by inducing it to approve and pay false and fraudulent claims, in violation of Conn. Gen. Stat. Ann. § 4-275(a)(3).

227.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state under medical assistance programs administered by the Department of Social Services of the State of Connecticut, in violation of Conn. Gen. Stat. Ann. § 4-275(a)(8).

228.     The State of Connecticut, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

229.     As a result of Defendants' conduct, the State of Connecticut has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT VIII
### Delaware False Claims and Reporting Act - Del. Code tit. 6, § 1201

230.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

231.     This is a civil action brought by Relator on behalf of the State of Delaware against Defendants under the State of Delaware's False Claims and Reporting Act, Del. Code Ann. tit. 6,

§ 1203(b)(1).

232.     This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §1201(a)(7).

233.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, directly or indirectly, to an officer or employee of the Government of the State of Delaware false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201(a)(1).

234.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

235.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Delaware by inducing it to approve and pay false and fraudulent claims, in violation of Del. Code Ann. tit. 6, §1201(a)(3).

236.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the Government of Delaware, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

237.     The State of Delaware, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and

continues to pay claims that would not be paid but for Defendants' wrongful conduct.

238.    As a result of Defendants' conduct, the State of Delaware has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT IX
### District of Columbia False Claims Act - D.C. Code § 2-381.01

239.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

240.    This is a civil action brought by Relator, on behalf of the District of Columbia against Defendants under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1).

241.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act. D.C. Code Ann. § 2-381.02(a).

242.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, a false or fraudulent claim for payment or approval, in violation of D.C. Code Ann. § 2-381.02(a)(l).

243.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may continue to be making, using, or causing to be made or used, false records and/or statements to get false claims paid or approved by the District, in violation of D.C. Code Ann. § 2-381.02(a)(2).

244.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the District of Columbia by inducing it to approve and pay false

and fraudulent claims, in violation of D.C. Code Ann. § 2-381.02(a)(7).

245.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, in violation of D.C. Code Ann. § 2-381.02(a)(6).

246.    The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

247.    As a result of Defendants' conduct, the District of Columbia has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT X**
**Florida False Claims Act - Fla. Stat. §§ 68.082**

248.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

249.    This is a civil action brought by Relator on behalf of the State of Florida against Defendants under the State of Florida's False Claims Act, Fla. Stat. Ann. § 68.083(2).

250.    This is a claim for treble damages and penalties under the Florida False Claims Act. Fla. Stat. Ann. § 68.082(2).

251.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of Fla. Stat. Ann. § 68.082(2)(a).

252.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or one of its agencies, in violation of Fla. Stat. Ann. § 68.082(2)(b).

253.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Florida by inducing it to approve and pay false and fraudulent claims, in violation of Fla. Stat. Ann. § 68.082(2)(c).

254.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of Fla. Stat. Ann. § 68.082(2)(g).

255.     The State of Florida, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

256.     As a result of Defendants' conduct, the State of Florida has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XI
## Georgia False Medicaid Claims Act, - Ga. Code § 49-4-168.1

257.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

258.     This is a civil action brought by Relator, on behalf of the State of Georgia, against Defendants pursuant to the State of Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-

168.2(b).

259.     This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act. Ga. Code Ann. § 49-4-168.1(a).

260.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to presented, and may still be presenting or causing to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

261.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

262.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit property or money to the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

263.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Georgia by inducing it to approve and pay false and fraudulent claims, in violation Ga. Code Ann. § 49-4-168.1(a)(3).

264.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or

improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit property or money to the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

265.    The State of Georgia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

266.    As a result of Defendants' conduct, the State of Georgia has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XII
## Hawaii False Claims Act - Haw. Rev. Stat. § 661-21.

267.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

268.    This is a civil action brought by Relator on behalf of the State of Hawaii and its political subdivisions against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. Ann § 661-25(a)

269.    This is a claim for treble damages and penalties under the Hawaii False Claims Act. Haw. Rev. Stat. Ann. § 661-21(a)

270.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. Ann. § 661-21(a)(l).

271.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used

or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. Ann. § 661-21(a)(2).

272.　Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. Ann. § 661-21(a)(6).

273.　Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Hawaii by inducing it to approve and pay false and fraudulent claims, in violation of Haw. Rev. Stat. Ann. § 661-21(a)(8).

274.　Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased obligations to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. Ann. § 661-21(a)(6).

275.　The State of Hawaii, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

276.　As a result of Defendants' conduct, the State of Hawaii has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XIII
### Illinois Whistleblower Reward and Protection Act - 740l. Comp. Stat. §§ 175/3

277.　Relator repeats and incorporates by reference the allegations contained in the

foregoing paragraphs of this Complaint as if fully set forth herein.

278.  This is a civil action brought by Relator on behalf of the State of Illinois against Defendants under the State of Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. § 175/4(b).

279.  This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act. 740 Ill. Comp. Stat. § 175/3(a).

280.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois or a member of the Illinois National Guard a false or fraudulent claim for payment or approval, in violation of 740 Ill. Comp. Stat. Ann. § 175/3(a)(1)(A).

281.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois, in violation of 740 Ill. Comp. Stat. Ann. § 175/3(a)(1)(B).

282.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of Illinois, in violation of 740 Ill. Comp. Stat. Ann. § 175/3(a)(1)(G).

283.  Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Illinois by inducing it to approve and pay false and

fraudulent claims, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(C).

284. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing obligations to pay or transmit money to the State of Illinois, in violation of 740 Ill. Comp. Stat. Ann. § 175/3(a)(1)(G).

285. The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

286. As a result of Defendants' conduct, the State of Illinois has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT XIV**
**Indiana False Claims and Whistleblower Protection Act - Ind. Code § 5-11-5.5**

287. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

288. This is a civil action brought by Relator on behalf of the State of Indiana against Defendants under the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. § 5-11-5.5-4(a).

289. This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act. Ind. Code Ann. §§ 5-11-5.5-2(b)

290. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Ind. Code Ann. §§ 5-11-5.5-2(b)(l), (8).

291.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Indiana, in violation of Ind. Code Ann. §§ 5-11-5.5-2(b)(2), (8).

292.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Indiana by inducing it to approve and pay false and fraudulent claims, in violation of Ind. Code Ann. §§ 5-11-5.5-2(b)(7).

293.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, in violation of Ind. Code Ann. §§ 5-11-5.5-2(b)(6),(8).

294.    The State of Indiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

295.    As a result of Defendants' conduct, the State of Indiana has been damaged, and continues to be damaged, in an amount to be determined at trial.

### COUNT XV
### Iowa False Claims Act - Iowa Code § 685.2

296.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

297.    This is a civil action brought by Relator on behalf of the State of Iowa against Defendants under the State of Iowa False Claims Act, Iowa Code Ann. § 685.3(2)(a).

298.     This is a claim for treble damages and penalties under the Iowa False Claims Act. Iowa Code Ann. § 685.2(1)

299.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Iowa Code Ann. § 685.2(1)(a).

300.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Iowa Code Ann. § 685.2(1)(b).

301.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Iowa, in violation of Iowa Code Ann. § 685.2(1)(g).

302.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Iowa by inducing it to approve and pay false and fraudulent claims, in violation of Iowa Code Ann. § 685.2(1)(c).

303.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing and improperly avoiding or decreasing obligations to pay or transmit money to the State of Iowa, in violation of Iowa Code

Ann. § 685.2(1)(g).

304.    The State of Iowa, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

305.    As a result of Defendants' conduct, the State of Iowa has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XVI
## Louisiana Medical Assistance Programs Integrity Law - La. Rev. Stat. § 46:438.3

306.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

307.    This is a civil action brought by Relator on behalf of the State of Louisiana's medical assistance programs against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1(A).

308.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law. La. Rev. Stat. Ann. § 46:438.6(B)(1)

309.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

310.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, engaged in misrepresentation, and may still be engaging in misrepresentation, or made, used, or caused to be made, and may still be making, using, or causing to be made, false records or statements to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev.

Stat. Ann. § 46:438.3(B).

311.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the medical assistance programs of the state of Louisiana, in violation of La. Rev. Stat. Ann. § 46:438.3(C).

312.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, attempted to defraud the Louisiana state medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

313.  Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Louisiana by inducing it to approve and pay false and fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

314.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary in violation of La. Rev. Stat. Ann. § 46:438.3(E)(1).

315.  The State of Louisiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

316.  As a result of Defendants' conduct, the State of Louisiana has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT XVII**
**Maryland False Health Claims Act - Md. Code Health-gen. § 2-601**

317.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

318.     This is a civil action brought by Relator on behalf of the State of Iowa against Defendants under the State of Maryland False Health Claims Act, Md. Code Ann., Health-Gen. § 2-604(a)(1)(i).

319.     This is a claim for treble damages and penalties under the Maryland False Health Claims Act. Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii).

320.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

321.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

322.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money to the State of Iowa, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(7).

323.     Through the acts more particularly set forth in the foregoing paragraphs,

Defendants conspired to defraud the State of Maryland by inducing it to approve and pay false and fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(3).

324. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money to the State of Iowa, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

325. The State of Maryland, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

326. As a result of Defendants' conduct, the State of Maryland has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XVIII
## Massachusetts False Claims Act - Mass. Gen. Laws ch. 12, §§ 5B

327. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

328. This is a civil action brought by Relator on behalf of the Commonwealth of Massachusetts against Defendants under the Massachusetts False Claims Act, Mass. Ann. Laws, ch. 12, § 5C(2).

329. This is a claim for treble damages and penalties under the Massachusetts False Claims Act.

330. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for

payment or approval to the Commonwealth of Massachusetts or its political subdivisions, in violation of Mass. Ann. Laws, ch. 12, § 5B(1).

331.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts or its political subdivisions in violation of Mass. Ann. Laws, ch. 12, § 5B(2).

332.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Commonwealth of Massachusetts by inducing it to approve and pay false and fraudulent claims, in violation of Mass. Gen. Laws ch. 12, § 5B(3).

333.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts or one of its political subdivisions, in violation of Mass. Ann. Laws, ch. 12, § 5B(8).

334.     The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

335.     As a result of Defendants' conduct, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT XIX**
**Michigan Medicaid False Claims Act - Mich. Comp. Laws serv. § 400.603**

336.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

337.     This is a civil action brought by Relator on behalf of the State of Michigan against Defendants under the State of Michigan Medicaid False Claims Act, Mich. Comp. Laws. Serv. § 400.610a(l).

338.     This is a claim for damages and penalties under the Michigan Medicaid False Claims Act. Mich. Comp. Laws. Serv. § 400.612(1)

339.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, or awareness of the nature of their conduct and awareness that it is substantially certain to cause the payment of a Medicaid benefit, made or caused to be made, and may still be making or causing to be made, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of Mich. Comp. Laws. Serv. § 400.603(1)

340.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, or awareness of the nature of their conduct and awareness that it is substantially certain to cause the payment of a Medicaid benefit, knowingly made or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws. Serv. § 400.603(2).

341.     Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly presented or made or caused to be presented or made, and may still be presenting or causing to be presented a false claim under the social welfare act, Act No.

280 of the Public Acts of 1939, as amended, in violation of Mich. Comp. Laws. Serv. § 400.607(1).

342.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Michigan by inducing it to approve and pay false and fraudulent claims, in violation of Mich. Comp. Laws. Serv. § 400.606(1)

343.     Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, used, or caused to be made or used a false record or statement, and may be continuing knowingly to make, use, or cause to be made or used a false record or statement, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act, in violation of Mich. Comp. Laws. Serv. § 400.607(3).

344.     The State of Michigan, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

345.     As a result of Defendants' conduct, the State of Michigan has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XX
## Minnesota False Claims Act - Minn. Stat. § 15c.02

346.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

347.     This is a civil action brought by Relator on behalf of the State of Minnesota and its political subdivisions against Defendants under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

348.     This is a claim for treble damages and penalties under the Minnesota False Claims

Act. Minn. Stat. § 15C.02(a).

349.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to an officer or employee of the state Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(1).

350.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(2).

351.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Minnesota by inducing it to approve and pay false and fraudulent claims, in violation of Minn. Stat. § 15C.02(a)(3).

352.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, in violation of Minn. Stat. § 15C.02(a)(7).

353.    The State of Minnesota, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

354.    As a result of Defendants' conduct, the State of Minnesota has been damaged, and

continues to be damaged, in an amount to be determined at trial.

**COUNT XXI**
**Montana False Claims Act - Mont. Code § 17-8-403**

355.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

356.    This is a civil action brought by Relator on behalf of the State of Montana against Defendants under the State of Montana False Claims Act, Mont. Code Ann. § 17- 8-406(1).

357.    This is a claim for treble damages and penalties under the Montana False Claims Act. Mont. Code Ann. § 17-8-403(l)

358.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to an officer or employee of a governmental entity, in violation of Mont. Code Ann. § 17-8-403(l)(a).

359.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved by a governmental entity, in violation of Mont. Code Ann. § 17-8-403(1)(b).

360.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Montana by inducing it to approve and pay false and fraudulent claims, in violation of Mont. Code Ann. § 17-8-403(l)(c).

361.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used,

or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana or one of its political subdivisions or contractors, in violation of Mont. Code Ann. § 17-8-403(l)(g).

362.     The State of Montana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

363.     As a result of Defendants' conduct, the State of Montana has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XXII
## Nevada False Claims Act - Nev. Rev. Stat. § 357.040

364.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

365.     This is a civil action brought by Relator on behalf of the State of Nevada against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.080(1).

366.     This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act. Nev. Rev. Stat. § 357.040(2)(a).

367.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Nev. Rev. Stat. § 357.040(l)(a).

368.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used

or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval for false claims in violation of Nev. Rev. Stat. § 357.040(1)(b).

369.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the State of Nevada by inducing it to approve and pay false and fraudulent claims, in violation of Nev. Rev. Stat. § 357.040(1)(i).

370.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada or one of its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

371.    The State of Nevada, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

372.    As a result of Defendants' conduct, the State of Nevada has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XXIII
## New Jersey False Claims Act - N.J. Stat. §§ 2A:32C-3

373.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

374.    This is a civil action brought by Relator, in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

375.    This is a claim for treble damages and penalties under the New Jersey False Claims

Act. N.J. Stat. Ann. § 2A:32C-3.

376.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to an employee, officer, or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds , in violation of N.J. Stat. Ann. § 2A:32C-3(a).

377.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the State of New Jersey, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

378.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the New Jersey State Government by inducing it to approve and pay false and fraudulent claims, in violation of N.J. Stat. Ann. § 2A:32C-3(c).

379.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey or one of its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

380.     The State of New Jersey, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and

continues to pay claims that would not be paid but for Defendants' wrongful conduct.

381.     As a result of Defendants' conduct, the State of New Jersey has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XXIV
### New Mexico Medicaid False Claims Act - N.M. Stat. § 27-14-4

382.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

383.     This is a civil action brought by Relator on behalf of the State of New Mexico against Defendants under the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7(B).

384.     This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act. N.M. Stat. Ann. § 27-14-4.

385.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(A).

386.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the state, in violation of N.M. Stat. Ann. § 27-14-4(C).

387.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of New Mexico by inducing it to approve and pay false and fraudulent claims. N.M. Stat. Ann. § 27-14-4(D).

388.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(E).

389.    The State of New Mexico, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

390.    As a result of Defendants' conduct, the State of New Mexico has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT XXV**
**New York State False Claims Act - New York State Finance Law §189**

391.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

392.    This is a civil action brought by Relator, on behalf of the State of New York, against Defendants pursuant to the New York False Claims Act, N.Y. State Fin. Law § 190(2).

393.    This is a claim for treble damages and penalties under the New York State False Claims Act. N.Y. State Fin. Law § 189(1)(h).

394.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

395.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

396. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of New York by inducing it to approve and pay false and fraudulent claims. N.Y. State Fin. Law § 189(1)(c)(h)

397. The State of New York, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

398. As a result of Defendants' conduct, the State of New York has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XXVI
## North Carolina False Claims Act - N.C. Gen. Stat. § 1-607

399. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

400. This is a civil action brought by Relator on behalf of the State of North Carolina against Defendants under the State of North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

401. This is a claim for treble damages and penalties under the North Carolina False Claims Act. N.C. Gen. Stat. § 1-607(a).

402. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

403.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1- 607(a)(2).

404.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the State of North Carolina in violation of N.C. Gen. Stat. § 1-607(a)(7).

405.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of North Carolina by inducing it to approve and pay false and fraudulent claims. N.C. Gen. Stat. § 1-607(a)(3).

406.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the State of North Carolina in violation of N.C. Gen. Stat. § 1-607(a)(7).

407.    The State of North Carolina, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

408.    As a result of Defendants' conduct, the State of North Carolina has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT XXVII**
**Oklahoma Medicaid False Claims Act - Okla. Stat. Tit. 63, § 5053 .1**

409.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

410.    This is a civil action brought by Relator, on behalf of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B).

411.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act. Okla. Stat. tit. 63, § 5053.1(B)

412.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be making or causing to be presented, to an officer or employee of the State of Oklahoma, false or fraudulent claims for payment or approval under the Oklahoma Medicaid program, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

413.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records and statements to get false or fraudulent claims paid or approved by the state of Oklahoma, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

414.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of Oklahoma by inducing it to approve and pay false and fraudulent claims. Okla. Stat. tit. 63, § 5053.1(B)(3).

415.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false

records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the state, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

416.    The State of Oklahoma, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

417.    As a result of Defendants' conduct, the State of Oklahoma has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XXVIII
## Rhode Island False Claims Act - R.I. Gen. Laws § 9-1.1-3

418.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

419.    This is a civil action brought by Relator, on behalf of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

420.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act. R.I. Gen. Laws § 9-1.1-3(a)(7).

421.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the state of Rhode Island false or fraudulent claims for payment or approval under the Rhode Island Medicaid program, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

422.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false

records or statements to get false or fraudulent claims paid or approved by the state of Rhode Island , in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

423.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of Rhode Island by inducing it to approve and pay false and fraudulent claims. R.I. Gen. Laws § 9-1.1-3(a)(3).

424.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the state, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

425.    The State of Rhode Island, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

426.    As a result of Defendants' conduct, the State of Rhode Island has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XXIX
## Tennessee Medicaid False Claims Act - Tenn. Code § 71-5-182

427.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

428.    This is a civil action brought by Relator on behalf of the State of Tennessee against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b)(1).

429.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act. Tenn. Code Ann. § 71-5-183(a)(1).

430.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee false or fraudulent claims for payment or approval under the Tennessee Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(l)(A).

431.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, in violation of Tenn. Code Ann. § 71-5-182(a)(l)(B).

432.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money, or property to the State of Tennessee, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

433.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of Tennessee by inducing it to approve and pay false and fraudulent claims. Tenn. Code Ann. § 71-5-182(a)(1)(C).

434.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the State of Tennessee, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

435. The State of Tennessee, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

436. As a result of Defendants' conduct, the State of Tennessee has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT XXX**
**Texas Medicaid Fraud Prevention Law - Tex. Hum. Res. Code § 36.002**

437. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

438. This is a civil action brought by Relator, on behalf of the State of Texas against Defendants pursuant to the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

439. This is a claim for double damages and penalties under the Texas Medicaid Fraud Prevention Law. Tex. Hum. Res. Code Ann. § 36.052(4).

440. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

441. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that

permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

442.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

443.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce—and may still be making, causing to be made, inducing or seeking to induce—false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

444.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of Texas by inducing it to approve and pay false and fraudulent claims, in violation of Tex. Hum. Res. Code Ann. § 36.002(9).

445.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, claims under the

Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

446.     The State of Texas, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

447.     As a result of Defendants' conduct, the State of Texas has been damaged, and continues to be damaged, in an amount to be determined at trial.

**COUNT XXXI**
**<u>Virginia Fraud Against Taxpayers Act - Va. Code § 8.01-216</u>**

448.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

449.     This is a civil action brought by Relator on behalf of the Commonwealth of Virginia against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

450.     This is a claim for treble damages and penalties under the Commonwealth of Virginia Fraud Against Taxpayers Act. Va. Code Ann. § 8.01-216.3(A)(7).

451.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth, a false or fraudulent claim for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(l).

452.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false

records or statements material to false or fraudulent claims to get false or fraudulent claims paid or approved by the Commonwealth, in violation of Va. Code Ann. § 8.01- 216.3(A)(2).

453.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the Commonwealth, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

454.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the Commonwealth of Virginia by inducing it to approve and pay false and fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(3).

455.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the Commonwealth, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

456.     The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

457.     As a result of Defendants' conduct, the Commonwealth of Virginia has been damaged, and continues to be damaged, in an amount to be determined at trial.

## COUNT XXXII
### Washington Medicaid Fraud False Claims Act- Wash. Rev. Code § 74.66.005

458.     Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

459.     This is a civil action brought by Relator on behalf of the State of Washington against Defendants under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.050(1).

460.     This is a claim for treble damages and penalties under the Washington Medicaid Fraud False Claims Act. Wash. Rev. Code § 74.66.050(1).

461.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the State of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(a).

462.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get false or fraudulent claims paid or approved by the State of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(b).

463.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

464.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the State of Washington by inducing it to approve and

pay false and fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(c).

465.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the State of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

466.    The State of Washington, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' wrongful conduct.

467.    As a result of Defendants' conduct, the State of Washington has been damaged, and continues to be damaged, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator Chad Dietz requests that judgment be entered against Defendants, ordering that:

A.    Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and the false claims statutes of the Plaintiff States.

B.    Defendants pay the United States and the Plaintiff States three times the amount of damages to the United States and the Plaintiff States.

C.    Defendants pay civil penalties of (a) $5,500-$11,000 for each violation of the federal FCA that occurred after September 29, 1999, but before November 2, 2015, and (b) $13,508-$27,018 for each violation of the FCA that occurred on or after November 2, 2015.

D.    Defendants pay the maximum civil penalties as provided under the false claims statutes of the Plaintiff States.

E.    Any other recoveries or relief provided for under the federal FCA and false claims statutes of the Plaintiff States, including prejudgment and post-judgment interest.

F.    Relator's receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs, based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

G.    On all Counts, judgment for the United States and the Plaintiff States, as applicable, against Defendants.

H.    Such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED:   August 21, 2024

Respectfully submitted,

By    /s/ *Jonathan Z. DeSantis*

Jonathan Z. DeSantis (PA Bar 316007, *pro hac vice* pending)
**WALDEN MACHT HARAN & WILLIAMS LLP**
Jonathan Z. DeSantis (PA Bar 316007, *pro hac vice* pending)
2000 Market Street, Suite 1430
Philadelphia, PA 19103
Tel: (215) 825-5283
jdesantis@wmhwlaw.com

**KIRK CHAPMAN LAW LLC**
Kirk Chapman (*pro hac vice* forthcoming)
415 East 37th Street, #29K

New York, New York 10016
Tel:     (917) 742-0402
kirkchapmanlaw@gmail.com

**THE DANIEL J. OCASIO
WHISTLEBLOWER LAW GROUP**

Daniel J. Ocasio (*pro hac vice* forthcoming)
200 Massachusetts Avenue NW, Suite 700
Washington, D.C. 20001
Tel:   (202) 580-6378, Ext. 101
docasio@djolawgroup.com

*Counsel for Relator Chad Dietz*

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed through the Court's ECF system, which will provide a copy to all counsel of record.

DATED:   August 21, 2024

Respectfully submitted,

By   _/s/ Jonathan Z. DeSantis_

Jonathan Z. DeSantis (PA Bar 316007, *pro hac vice* pending)

*Counsel for Relator Chad Dietz*